**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2587

_____

| | | |
|---|---|---|
| Deborah Patterson, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Tenet Healthcare, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: January 15, 1997
Filed: May 12, 1997

_____

Before WOLLMAN and FLOYD R. GIBSON, Circuit Judges, and MONTGOMERY,[1] District Judge.

_____

WOLLMAN, Circuit Judge.

Deborah Patterson appeals from the district court's[2] order dismissing her employment discrimination claims against her former employer, Tenet Healthcare, Inc. (Tenet). We affirm.

_____

[1]The HONORABLE ANN D. MONTGOMERY, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

## I.

Patterson became employed in 1989 as a medical technologist at Columbia Regional Hospital, which is owned and operated by Tenet. On March 5, 1993, she received a copy of Tenet's employee handbook and signed an arbitration clause set forth on the last page of the handbook.

On July 26, 1993, and again on January 18, 1994, Patterson filed charges with the Equal Employment Opportunities Commission (EEOC) and Missouri Commission on Human Rights (MCHR) after receiving treatment she believed to be discriminatory and retaliatory. On December 8, 1994, Patterson filed a grievance through Tenet's internal grievance apparatus, the "Fair Treatment Procedure." Patterson's grievance proceeded through investigation and discussion to a hearing before the Fair Treatment Committee. Patterson was terminated nine days prior to the hearing, and she amended her grievance to include her termination. Her grievance was ultimately denied.

Patterson did not submit her claim to the final step of the Fair Treatment Procedure, binding arbitration, and instead filed suit in the district court, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII), and the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010 et seq. (MHRA). Finding that Patterson had agreed to arbitrate, that the Federal Arbitration Act (FAA) governed Patterson's claims arising out of her employment with Tenet, and that these claims were arbitrable, the district court dismissed Patterson's complaint. On appeal, Patterson argues that she did not agree to arbitrate and that the FAA does not govern her claims.

## II.

We first consider whether Patterson and Tenet agreed to arbitrate. Under the FAA, ordinary contract principles govern whether parties have agreed to arbitrate,

see Daisy Mfg. Co., Inc. v. NCR Corp., 29 F.3d 389, 392 (8th Cir. 1994), principles that in this case are derived from Missouri law. See First Options of Chicago, Inc. v. Kaplan, 115 S. Ct. 1920, 1924 (1995). Two portions of the handbook are at issue in determining whether such a contract exists. Page 3 provides:

> [This handbook] is not intended to constitute a legal contract with any employee or group of employees because that can only occur with a written agreement executed by a facility Executive Director and an AMI[3] Senior Executive Officer. As regards the Fair Treatment Procedure, AMI is committed to accepting the obligation to support and assure access to the binding arbitration procedure for solving disputes, if necessary. Situations may arise from time to time which, in the Company's judgement require procedures or actions different than those described in this document or other written policies. Since the Company maintains the sole and exclusive discretion to exercise the customary functions of the management in all areas of employment and Company operations, the judgement of management shall be controlling in all such situations. Employees have access to a grievance procedure described in this document that affords the opportunity to have any employment related disputes submitted to binding arbitration.

Page 31 of the handbook contains the following heading:

**IMPORTANT!**

***Acknowledgment Form***

> Upon receipt, please sign and present the acknowledgment form of this **handbook** to the Human Resources Department.
>
> . . . .

---

[3]AMI was the predecessor of Tenet.

. . . No written agreement concerning employment terms or conditions is valid unless signed by a facility executive director, and senior officer of AMI, and no written statement or agreement in this handbook concerning employment is binding, since provisions are subject to change, and as all AMI employees are employed on an "at will" basis. . . . The company reserves the right to amend, supplement, or rescind any provisions of this handbook as it deems appropriate in its sole and absolute discretion.

I understand AMI makes available arbitration for resolution of grievances. I also understand that as a condition of employment and continued employment, I agree to submit any complaints to the published process and agree to abide by and accept the **final decision** of the arbitration panel as ultimate resolution of my complaint(s) for any and all events that arise out of employment or termination of employment.

The district court found that this arbitration clause, which Patterson signed, created a binding contract to arbitrate.

Under Missouri law, employee handbooks generally are not considered contracts, because they normally lack the traditional prerequisites of a contract. See Johnson v. McDonnell Douglas Corp., 745 S.W.2d 661, 662 (Mo. 1988) (en banc). An employer's unilateral act of publishing a handbook is not a contractual offer to the employee. See id. Rather, a contract is only formed with the traditional elements of offer, acceptance, and consideration. See id. at 662-63.

Patterson points to the statement on page 3 of the handbook that "[the handbook] is not intended to constitute a legal contract," and to the statement on page 31 that "no written statement or agreement in this handbook concerning employment is binding," as evidence that the handbook did not create a binding contract.

We conclude, however, that the arbitration clause is separate from the other provisions of the handbook and that it constitutes an enforceable contract. See

-4-

Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805, 808-09 (2d Cir. 1960) (citing Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir. 1959)) (arbitration clause may constitute separate and enforceable contract). First, the arbitration clause is separate and distinct. It is set forth on a separate page of the handbook and introduced by the heading, **"IMPORTANT!** *Acknowledgment Form."* This page is removed from the handbook after the employee signs it and is stored in a file. In addition, there is a marked transition in language and tone from the paragraph preceding the arbitration clause to the arbitration clause itself. Although the preceding paragraph discusses the company's reservation of its "right to amend, supplement, or rescind" any handbook provisions, the arbitration clause uses contractual terms such as "I understand," "I agree," I "agree to abide by and accept," "condition of employment," "final decision," and "ultimate resolution." We believe that the difference in language used in the handbook and that employed in the arbitration clause would sufficiently impart to an employee that the arbitration clause stands alone, separate and distinct from the rest of the handbook. The reservation of rights language refers to the handbook provisions relating to employment, not to the separate provisions of the arbitration agreement.

## III.

The next question is whether the FAA governs the agreement to arbitrate. The purpose of the FAA "was to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). The FAA provides that an agreement to arbitrate disputes arising out of contracts involving maritime or interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 1 of the FAA, however, exempts from FAA enforcement "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The district court held that

section 1 exempts only those employees directly engaged in the movement of maritime or interstate commerce and therefore found that the FAA governed Patterson's claims.

We have not heretofore addressed the question whether section 1 of the FAA should be interpreted broadly or narrowly. We are persuaded by the reasoning of those circuits which have held that section 1 applies only to contracts of employment for those classes of employees that are engaged directly in the movement of interstate commerce. See Great Western Mortgage Corp. v. Peacock, No. 96-5273, 1997 WL 153012 at *4 (3d Cir. Apr. 3, 1997) (reaffirming Tenney Engineering, Inc. v. United Elec. Radio & Mach. Workers of Amer., Local 437, 207 F.2d 450, 452 (3d Cir. 1953) (en banc)); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1472 (D.C. Cir. 1997); Rojas v. TK Communications, Inc., 87 F.3d 745, 748 (5th Cir. 1996); Asplundh Tree Expert Co. v. Bates, 71 F.3d 592, 600-601 (6th Cir. 1995); Miller Brewing Co. v. Brewery Workers Local Union No. 9, AFL-CIO, 739 F.2d 1159, 1162 (7th Cir. 1984); Erving v. Virginia Squires Basketball Club, 468 F.2d 1064, 1069 (2d Cir. 1972); Dickstein v. duPont, 443 F.2d 783, 785 (1st Cir. 1971). Only the Fourth Circuit has interpreted section 1 broadly. See United Elec. Radio & Machine Workers of Amer. v. Miller Metal Prods., 215 F.2d 221, 224 (4th Cir. 1954). That ruling, however, was explicitly limited to the collective bargaining context. See id.

As the District of Columbia Circuit has explained, two well-established canons of statutory construction compel a narrow interpretation. See Cole, 105 F.3d at 1470. The first canon counsels avoiding a reading which would render some words entirely redundant. See id. A broad reading of section 1 would run counter to this canon, for if the phrase "'any other class of workers engaged in foreign or interstate commerce'-- extended to all workers whose jobs have any effect on commerce, the specific inclusion of seamen and railroad workers would have been unnecessary." Id. See also Rojas, 87 F.3d at 748 (quoting Albert v. National Cash Register Co., 874 F. Supp. 1324, 1327 (S.D. Fla. 1994)) ("'[i]t is quite impossible to apply a broad meaning to the term

"commerce" in Section 1 and not rob the rest of the exclusion clause of all significance.'").

The second applicable canon is the rule of ejusdem generis, which "'limits general terms which follow specific ones to matters similar to those specified.'" <u>Cole</u>, 105 F.3d at 1471 (quoting <u>Gooch v. United States</u>, 297 U.S. 124, 128 (1936)). Applying this rule, the phrase "any other class of workers engaged in foreign or interstate commerce" is modified by the preceding terms "seamen" and "railroad employees," and therefore the phrase includes "only those other classes of workers who are likewise engaged directly in . . . the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it." <u>Tenney</u>, 207 F.2d at 452.

Moreover, as the <u>Cole</u> court pointed out, the Supreme Court's decision in <u>Allied-Bruce Terminix Cos., Inc. v. Dobson</u>, 115 S. Ct. 834 (1995), supports a narrow interpretation of the exclusionary clause in section 1. There, the Court, construing section 2 of the FAA, compared the words "involving commerce" used in section 2 with the words "in commerce." It concluded that the words "involving commerce" are broader than "in commerce" and that "[t]hey therefore cover more than '"only persons or activities *within the flow* of interstate commerce."'" <u>Id.</u> at 839 (emphasis in original) (quoting <u>United States v. American Bldg. Maintenance Indus.</u>, 422 U.S. 271, 276 (1975) (in turn quoting <u>Gulf Oil Corp. v. Copp Paving Co., Inc.</u>, 419 U.S. 186, 195 (1974))). This analysis suggests that for the words "in commerce" as used in section 1, the converse is true--that the latter words of art describe only those workers actually involved "within the flow" of interstate commerce. <u>See</u> <u>Cole</u>, 105 F.3d at 1471-72.

Patterson argues that the legislative history of section 1 reveals that Congress intended to exempt all employment contracts from the FAA. Even assuming that the legislative history may be so read, <u>see</u> <u>Gilmer</u>, 500 U.S. at 39-40 (Stevens, J., dissenting), we agree with the D.C. Circuit that "In a case such as this, where the

statutory text does not admit of serious ambiguity, and where firmly established case law is absolutely clear on the meaning of the statute, legislative history is, at best, secondary, and, at worst, irrevelant." Cole, 105 F.3d at 1472 (citing Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 808-09 n.3 (1989)).

Accordingly, we hold that section 1 does not exclude the arbitration agreement between Patterson and Tenet from the coverage of the FAA and that the arbitration agreement is thus enforceable.

## IV.

Finally, we determine whether Patterson's discrimination claims are arbitrable. Our analysis on this point is controlled by Gilmer, in which the Supreme Court held that arbitration of a stock broker's claim under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., is not inconsistent with the statute's framework or purposes. "It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." 500 U.S. at 26.

The Court distinguished its holding in Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974), that arbitration procedures under a collective bargaining agreement (CBA) do not preclude a civil remedy for a violation of Title VII. See Alexander, 415 U.S. at 59-60. One concern with enforcing arbitration under a CBA is that the arbitration agreement is obtained by a union that represents the majority's interests rather than the individual's interests, which creates "tension between collective representation and individual statutory rights." Gilmer, 500 U.S. at 34-35; see Alexander, 415 U.S. at 51; Pryner v. Tractor Supply Co., 109 F.3d 354, 364 (7th Cir. 1997). Another concern is that labor arbitrators are generally only authorized under CBAs to resolve contractual, and not statutory, claims. Gilmer, 500 U.S. at 34. Accordingly, we have held that arbitration agreements contained within a CBA do not bar civil claims under Title VII. See Varner v. National Super Markets, Inc., 94 F.3d

1209, 1213 (8th Cir. 1996), cert. denied, 117 S. Ct. 946 (1997); Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1326 n.3 (8th Cir. 1994).

In contrast, an arbitration agreement such as the one Patterson entered into represents the interests of the individual. See Gilmer, 500 U.S. at 35; Pryner, 109 F.3d at 363 ("[W]orkers' statutory rights . . . . are arbitrable if the worker consents to have them arbitrated."). In addition, the arbitration agreement in the present case does not limit the arbitrator solely to interpretation of the contract. See Gilmer, 500 U.S. at 35. The CBA cases, therefore, "provide no basis for refusing to enforce [an individual consentual] agreement to arbitrate." Id.

Thus, we agree with those post-Gilmer decisions which have ruled that Title VII claims, like ADEA claims, are subject to individual consentual agreements to arbitrate. See Cole, 105 F.3d at 1481-82; Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 882 (4th Cir.), cert. denied, 117 S. Ct. 432 (1996); Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1487 (10th Cir. 1994); Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698, 700 (11th Cir. 1992) (per curiam); Mago v. Shearson Lehman Hutton, Inc., 956 F.2d 932, 935 (9th Cir. 1992); Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 308 (6th Cir. 1991); and Alford v. Dean Witter Reynolds, Inc., 939 F.2d 229, 230 (5th Cir. 1991) (after remand for reconsideration in light of Gilmer). Gilmer necessarily rejected "'[a]ny broad public policy arguments against such a conclusion.'" Metz, 39 F.3d at 1487 (quoting Alford, 939 F.2d at 230). "'Congress closely modeled the ADEA upon Title VII,'" and "'[t]he statutes are similar both in their aims and in their substantive prohibitions.'" Metz, 39 F.3d at 1487 (quoting Cooper v. Asplundh Tree Expert Co., 836 F.2d 1544, 1553-54 (10th Cir. 1988)). Moreover, the arbitrability of Title VII claims finds support in the Civil Rights Act of 1991, which states that "the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under the Acts or provisions of federal law amended by this title." Pub. L. No. 102-166, § 118, 105 Stat. 1071, 1081 (1991).

In Swenson v. Management Recruiters Int'l, Inc., 858 F.2d 1304 (8th Cir. 1988), we held that an employee was not bound by an arbitration agreement with respect to her Title VII claims. We were concerned that the arbitral forum was unable to adequately "assist[] victims of discrimination" or to "pay sufficient attention to the transcendent public interest in the enforcement of Title VII." Id. at 1307. Gilmer, however, instructs us that both of these goals will be met through arbitration. First, resolution of a claim in an arbitral forum must "'effectively . . . vindicate [the employee's] statutory cause of action.'" Gilmer, 500 U.S. at 28 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 (1985)). This vindication must be accomplished through the use of neutral arbitrators, adequate discovery, adequate types of relief, and the reassurance that coercion which would allow the revocation of any contract would likewise relieve an employee from an arbitration agreement. See Gilmer, 500 U.S. at 30-33; see also Cole, 105 F.3d at 1482. Second, the public policy of the statute will be carried out through suits of employees who are not parties to arbitration agreements, through EEOC actions, and through the vindication of individual claims through arbitration. See Gilmer, 500 U.S. at 31-32. So long as such vindication takes place, "'the statute will continue to serve both its remedial and deterrent function.'" Id. at 28 (quoting Mitsubishi, 473 U.S. at 637).

Although one panel of this court ordinarily cannot overrule another panel, this rule does not apply when the earlier panel decision is cast into doubt by a decision of the Supreme Court. See City of Timber Lake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 557 (8th Cir. 1993). Gilmer has effectively overruled our holding in Swenson, and thus we hold that Patterson's Title VII claims are subject to arbitration. Similarly, Patterson's claims under the MHRA are arbitrable. State anti-discrimination laws that parallel Title VII are explicitly made a part of Title VII's enforcement scheme, and therefore the FAA has the same application to claims under these state laws as to claims under Title VII. See Prudential Ins. Co. of Amer. v. Lai, 42 F.3d 1299, 1303 at n.1 (9th Cir. 1994), cert. denied, 116 S. Ct. 61 (1995).

The judgment is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.