**Elina OZOLINS, Plaintiff,**

v.

**NORTHWOOD–KENSETT COMMUNITY SCHOOL DISTRICT, Defendant.**

**No. C97–3097–PAZ.**

United States District Court, N.D. Iowa, Central Division.

March 17, 1999.

Randall Nielsen of Mason City, Iowa, for plaintiff Elina Ozolins.

Joel Yunek of Mason City, Iowa, for Northwood–Kensett Community School District.

I.   INTRODUCTION ................................................ 1057
II.  STATEMENT OF FACTS ........................................ 1058
III. ARGUMENT .................................................. 1062
     A.  Did the Plaintiff Properly Request leave under the FMLA? ............. 1062
     B.  Did the Plaintiff's Mother Suffer from a Serious Health Condition? ..... 1064
     C.  Did The Plaintiff Prove That The Defendant Retaliated Against Her
         Because She Took FMLA Leave? ................................... 1065
     D.  Did the Failure of the Plaintiff to Follow the Grievance procedure in the
         Collective Bargaining Agreement Deprive this Court of Jurisdiction
         under the FMLA Claim? ........................................ 1066
IV.  CONCLUSION ................................................ 1068

## MEMORANDUM OPINION AND ORDER

ZOSS, United States Magistrate Judge.

### I. INTRODUCTION

This case arises under the Family Medical Leave Act (hereinafter "FMLA"), 29 U.S.C. §§ 2601–2654 (West 1999). The FMLA, inter alia, allows covered employees to take medical leave to care for a parent with a serious health condition. 29 U.S.C. § 2612(a)(1)(C) (West 1999). The question here is whether the plaintiff was entitled to take leave under the FMLA in February 1997, to care for her ailing mother. The plaintiff claims that she was. The defendant claims that the FMLA does not apply to the facts in the present case because her mother was not suffering from a "serious health condition," and that even if it does, the plaintiff is not entitled to pursue a claim under the FMLA because she did not give proper notice to her employer and did not first exhaust remedies provided by a collective bargaining agreement under which she worked.

On October 1, 1997, the plaintiff, Elina Ozolins ("Elina"), filed a complaint against her employer, the defendant Northwood–Kensett Community School District ("School District"), alleging that in Febru-

ary 1997, she requested leave under the FMLA to care for her ailing mother, that her request was wrongfully denied, that she took the requested leave without the approval of the defendant, and that she was suspended for doing so. She asks for money damages for the salary she lost while under suspension, liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii), attorney fees, litigation expenses, interest, and removal from her employee records of all references to the disciplinary action and suspension.

The School District answered the complaint on November 6, 1997, denying any liability under the FMLA and affirmatively alleging that the plaintiff failed to give adequate notice under the FMLA, failed to follow grievance procedures outlined in her employment contract, and that her mother was not suffering from a serious health condition at the time of the requested leave.

Trial before the court was held February 11, 1999, in Mason City, Iowa. The plaintiff was represented by Randall Nielsen. The defendant was represented by Joel Yunek. The matter is now fully submitted.

## II. STATEMENT OF FACTS

At the time of trial, the plaintiff, Elina Ozolins ("Elina"), had been a music teacher with the defendant Northwood–Kensett Community School District ("School District") in Northwood, Iowa, for 11 years, dividing her time between the elementary school and the secondary school. Alexandra Ozolins ("Alexandra"), Elina's mother, was 79 years old, and lives alone in Spencer, Iowa. In recent years, Alexandra has been in poor health.

Alexandra was originally from Latvia, and was in the Auschwitz concentration camp before coming to the United States. In February 1994, her husband passed away. By the beginning of 1997, when the incident which is the subject of this lawsuit took place, Alexandra was suffering from a number of health problems, including heart disease with angina (she had had a serious heart attack several years earlier), significant coronary artery disease, colon problems (diverticulitis), ulcers, small strokes (resulting in blindness in her right eye), diarrhea with bleeding, internal hemorrhoids, and a history of back surgery. (Plaintiff's Exs. 1–2, 3; Defendant's Ex. A.) In addition to her physical problems, she suffered from depression, flashbacks to her concentration camp experiences, and sleep difficulties, (Ex. A.). She also had a recurrent problem with falls.

On Saturday, January 25, 1997, Alexandra was attempting to move a 50 pound bag of bird seed from outside of her house into her garage when she fell on the concrete floor of her garage. The bag landed on top of her, and she suffered a severe bruise on her left hip. At the time of the fall, Alexandra was suffering from a number of stresses in her life in addition to her continuing health problems. She was depressed about her failing health and about the anniversary of the death of her husband. She had a strong attachment to four dogs and a pet goose, and the goose had recently died and one of her dogs was suffering from terminal bone cancer. Her problems were compounded by her reluctance to communicate the seriousness of her condition to anyone out of fear that she would be placed in a nursing home and would lose her independence.

On the days following the fall, Alexandra's condition began to worsen, resulting in severe pain. She could not get up after lying down, and she could not bathe except to wash her face. On Tuesday, January 28, 1997, she finally went to see Ronald Creswell, M.D., her regular treating physician. Dr. Creswell noted that Alexandra suffered from ischemic heart disease with a history of heart attack, diverticulitis, colon polyps, and constipation. He also noted, in an addendum, that she had fallen and injured her hip, and had a hematoma but no fracture.

Although her daughter, Elina, called Alexandra regularly, Alexandra did not tell her about the severity of her problems because of her fear that she would be institutionalized. After school on Friday, January 31, 1997, Elina drove to Spencer to visit her mother, as she did on many weekends.[1] When Elina arrived, she found Alexandra lying on a mattress on the floor next to one of her dogs. Elina was alarmed at her mother's condition. She looked as if she had no strength and had not been eating. She also had bags under her eyes and looked like she had been crying. Elina did not believe that her mother was capable of taking care of herself in her condition.

Elina stayed with her mother over the weekend, and noted that her mother's condition worsened. On Sunday evening, Elina attempted to persuade her mother to go to the emergency room, but her mother refused. Instead, Alexandra asked Elina if she would care for her that week. This was unusual, because Alexandra had never before asked Elina to miss work to care for her.

Early Monday morning, February 3, 1997, Elina returned to the School District, planning to teach school that day and then

1. By car, it took Elina about two hours to drive from Northwood to Spencer.

take leave for the remainder of the week to care for her mother. The ordinary procedure for requesting leave was to fill out a form and to present it to the principal of the school where she was teaching that day, who would then transmit the form to the superintendent for consideration. When Elina arrived at the elementary school for her work that day, she immediately went to the office of Julie Hansen, the principal, but found no one there. She could not locate a leave form, so she wrote the following note on a plain piece of paper:

> I would like to request the rest of this week to help take care of my mother. She fell Friday—had x-rays—nothing broken[2] but is hard for her to walk. Her family doctor is Dr. Ronald Creswell in Spencer, if need of verification.

(Ex. F.) She left this note on the desk of the principal, along with the following additional note:

> I wanted to get this request in to you and Mr. McIntire [the superintendent] as soon as I could. If you have any questions—I've got lessons from 10:02 to 11:30. You can get me then. Thanks, Elina.

*Id.*

Later that morning, Hansen took the notes to the School District superintendent, Jerry McIntire. McIntire looked up Elina's leave record and decided that she had already taken too much leave, so he directed Hansen to prepare a note to Elina denying her request. Hansen then typed up a note which stated the following:

> I shared your request with Mr. McIntire. It has been decided to deny your request.

(Ex. G.) Hansen attached this note to another note which stated:

Elina, I would like to talk with you, but wanted to get this to you when I could. Julie

*Id.* Hansen took the notes to Elina, but Elina was busy teaching so Hansen left them on a piano.

After Elina reviewed the notes, she completed teaching her morning classes and went to Hansen's office.[3] Elina and Hansen then had a heated conversation. Elina testified to the following version of the conversation. Elina asked Hansen why her request for leave had been turned down, and Hansen responded that Elina had missed too many school days. Elina replied that any days she had taken were allowed under her contract. Hansen replied that Elina's mother's condition was not serious enough to justify the leave. Elina responded by describing, in detail, her mother's condition. Hansen suggested that Elina should put her mother in a nursing home. At that point, Elina became angry and stated that she was entitled to take the leave under the FMLA.[4] Hansen said that the FMLA did not apply to Elina, and Elina responded that the FMLA did apply, and that under the Act she was entitled to take up to three months. Hansen stated that Elina would have to talk to Mr. McIntire about the situation, and Elina left.

Hansen had a different version of the conversation. According to her, Elina was upset when she came to her office, and stated that her request for leave could not be denied under the FMLA and that if the leave was not approved she would take off the entire month of March. Hansen specifically denied suggesting that Elina put her mother in a nursing home or that the FMLA did not apply to the situation. Hansen told Elina to take up the matter of

---

**2.** The note misstates the date of the fall, and incorrectly states that x-rays had been taken. The court believes these errors are innocent, and probably the result, in part, of misinformation provided by Alexandra to Elina.

**3.** Elina testified that she went to Hansen's office at lunch, while Hansen testified that

Elina came to her office after school. The court finds this conflict in the testimony to be immaterial.

**4.** Elina testified that she was aware of the Family Medical Leave Act from a poster in the teacher's lounge. (Ex. E.)

the FMLA with McIntire. Elina responded that she was on her way to talk with him, and left. Hansen called McIntire and told him that Elina was on the way to see him and that he should be prepared to discuss the FMLA. Hansen memorialized her recollection of the conversation in a memorandum. (Ex. I.)

The court finds that during this conversation Elina gave Hansen the details of her mother's overall physical and mental condition and advised Hansen that, despite the denial of her leave request, she was taking off from work for the remainder of the week to care for her mother. The court also finds that Elina and Hansen had a misunderstanding about whether Elina was planning to go to McIntire's office to discuss the situation further.

McIntire remained in his office until 5:50 p.m. waiting to talk with Elina, but Elina did not show up. Instead, after completing her school day and a previously scheduled private lesson, Elina left Northwood for Spencer. That evening, Elina called John Dayton, the principal of the secondary school, where she was scheduled to teach the next day (Tuesday, February 4, 1997). Elina told Dayton that she would not be at the school to teach on Tuesday. Dayton memorialized his recollection of the telephone conversation in (Ex. J.)

On Tuesday morning, February 4, 1997, Elina went to Dr. Creswell's office and asked Dr. Creswell's nurse for a note concerning her mother's condition. Creswell's nurse prepared the following note, which was approved and signed by Creswell: "Elina's mother is having medical problems and Elina's help is needed. Could she please be excused from school for a few days." (Ex. B.) Elina faxed this note to McIntire's office. Because of a snowstorm, school on Tuesday was canceled, but McIntire received the note on Wednesday morning when he arrived at school.

Elina remained in Spencer to care for her mother for the remainder of the week, and had no further contact with anyone at the school until she returned to work on Monday morning, February 10, 1997.

At about 3:15 p.m. on Monday, Hansen delivered a note to Elina stating that McIntire wanted to see her at 3:30 p.m. that day and that Elina should bring a union representative with her. Elina went to McIntire's office as requested. McIntire informed Elina that she had been insubordinate and that he wanted her resignation by the next morning, effective at the end of the school year. McIntire told Elina that he was upset because she had not submitted her request for leave on a proper leave request form, (Ex. N.).[5] McIntire also told Elina that he had not approved her leave request because she had used up both of her personal days and was in charge of a band concert scheduled for February 20, 1997, that would require all of her time and effort: McIntire provided Elina with a letter summarizing his position. (Ex. H.)

The teachers at the School District were represented by a local union, NKEA, and by a state union, ISEA. Elina was a member of the union until 1994, when she quit. After Elina's meeting with McIntire, she asked the union to help in her problems with the School District. The local union, after checking with the state union, refused to help her because she was not a member of the union.

Elina did not submit her letter of resignation to McIntire as he had requested, but McIntire reconsidered and decided that termination was not appropriate. Instead, he concluded that Elina should be suspended for 10 days, including the three days of school she missed during the week of February 3. On February 12, 1997, McIntire sent Elina a letter communicat-

---

**5.** There was also some discussion in the testimony about the failure of Elina to use a special leave form for leave under the FMLA. (Ex. O.) The only copies of the special form for requesting FMLA leave were kept by McIntire, and the employees of the School District were not advised of the existence of the form until after February 1997. The court finds that this form has no relevance to this case.

ing this change in his position to her. (Ex. L.)

Because McIntire did not have authority to suspend a teacher without school board approval, the controversy was presented to the Northwood–Kensett Board of Education on February 27, 1997. (Ex. R.) McIntire gave the following testimony before the board:

Basically what happened on that particular day is Ms. Hansen, who's our elementary principal, and I had a meeting that morning to discuss some issues pertaining to the buildings that she manages and in the process in that meeting she brought a slip of paper from Mrs. Ozolins requesting that she be allowed to have the rest of the week off to take care of her mother. Her mother had fallen the previous Friday. She had x-rays taken. She didn't have any broken bones. She was not hospitalized. She was basically sent home. She had difficulty walking and that's based on the statement that I received on the leave request. In the process of reviewing our Master Contract—I have copies of that section of the contract if the Board later wants to read this in deliberation, they can have this—you're welcome to look at it later, but basically there is a number of items in that particular contract that its fine to negotiate with the local teachers association and the school board. They [sic] are eight different types of leave that the person can request under the Master Contract. That particular contract also deals with all the other employees of our district. In reviewing the information that was there, it was my determination that particular leave would come under 8.6, which was under Leave, and basically says in there—paraphrasing—the Superintendent has the authority to grant that particular leave with or without pay. Based on the circumstances of not hospitalized, I told Ms. Hansen I was going to deny that leave request for the rest of the week. She took that request back and informed Ms. Ozolins that I had turned down her leave request. She

became, according to Ms. Hansen, very upset and became a little bit angry—I wasn't there, I'm going by what Ms. Hansen told me. At that particular time, she threatened to take the month of March off if she didn't get her way and get those four days off. That being the case, after she got angry, Ms. Hansen tried to get her calmed down a little bit. She brought up the fact "well, I'm using the Family Medical Leave Act," which means basically employees can get 12 weeks off without pay and can be used in place of their regular pay and sick leave. At that time, Ms. Hansen said you need to talk to the Superintendent. I'm not sure—she can address that later when we ask her to state what she heard from Ms. Ozolins. At no time during February 3 did I have a visit from her. I didn't get a phone call. I heard nothing. Absolutely nothing. I waited here until 10 minutes to six on that Monday evening in case she would come over to see me. I had a Lyon's Club board meeting at 6:00 and I thought I would just stay and work until that time and made myself available for her to come visit with me about this circumstance. She chose not to do that. At approximately 9:25 – 9:30 p.m., that evening, Mr. John Dayton, our high school and junior high principal, received a call from Mrs. Ozolins stating that she would not be to work on Tuesday. the concern I have in the situation is that her leave had been denied and she chose to take time off anyhow. She went home after school sometime Monday evening and didn't return back to our district until February 10, 4 days. No contact was made with me at any time during that particular period of time. There was no indication in the original request that she was even requesting family medical leave. You have to request those types of things. They are just not granted. You don't walk off the job based on what you think you can do. I think this particular situation was gross negligence on behalf of a

staff member. I will not tolerate that type of conduct by an employee. (Ex. T.) The Board approved the proposed sanction by a unanimous vote. (Exs. U and V.) As a result of the Board's action, a total of $971.32 was deducted from Elina's paychecks from April through August of 1997.[6]

The court finds that the suspension and the deductions from Elina's paychecks were imposed by the School District as a direct result of the leave taken by Elina on February 3, 4, 5, 6, and 7, 1997, and for no other reason.

The Northwood–Kensett Community School Master Contract for 1996–97 was admitted into evidence as Exhibit D. The material provisions of the contract are attached to this opinion as Appendix A.

The court will now apply these facts to the legal issues in the case. The court will make additional factual findings where necessary.

### III. ARGUMENT

#### A. Did the Plaintiff Properly Request leave under the FMLA?

On Monday morning, February 3, 1997, the plaintiff gave written notice to the School District that she planned to take leave for the remainder of the week to care for her mother. She stated in her written notice that she would make herself available to answer any questions. Rather than asking questions, the School District superintendent simply denied the request. Later that same day, before the plaintiff actually took the requested leave, she had a discussion with her principal in which she specifically invoked the FMLA and gave further details in support of her leave request. The court must address the following questions concerning the notice given by the plaintiff to her employer: (1) whether, under the FMLA, the plaintiff's notice was timely, and (2) whether, under the FMLA, the plaintiff gave the defendant adequate notice of the facts supporting her request for leave.

FMLA regulations require employees to provide timely and adequate notice of the need to take leave to their employers. Where the need for leave is foreseeable, as with planned medical treatment, the employee must provide at least thirty days advance notice before FMLA leave is to begin. 29 C.F.R. § 825.302(a) (1999). If thirty days notice is not practicable because of a lack of knowledge of approximately when leave will begin, the employee should give notice as soon as practicable. *Id.* In situations where the approximate timing of the need for leave is not foreseeable, the employee is to give notice "as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a) (1999). Generally, this means no more than two days after learning of the need for the leave. *Id.*

The plaintiff first learned about her mother's fall on Friday evening, January 31, 1997, when she arrived at her mother's house for a weekend visit. She then watched her mother's condition deteriorate over the weekend. After her mother refused to go to the emergency room on Sunday night, the plaintiff realized that her mother would likely be incapacitated throughout the week of February 3, 1997. Although the plaintiff was well aware of her mother's poor health and her propensity to fall well before the weekend of January 31, 1997, she did not know that her mother had fallen and injured herself until that weekend, and she could not have known that she would need to take leave until that Sunday evening, when she first realized that her mother would need her help during the following week. The court finds that the plaintiff's need for FMLA leave was not known to her until Sunday, February 2, 1997, and was not foreseeable before that date.

Federal regulations concerning notice required for leave under the FMLA where, as here, the need for FMLA leave is not foreseeable provide as follows:

---

**6.** This represents seven days of pay at a daily rate of $138.76. (Ex. W.)

When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible.

29 C.F.R. § 825.303(a) (1999). The regulations define "as soon as practicable" to mean "as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case." 29 C.F.R. § 825.302(b) (1999).

The court finds that the plaintiff fully complied with these regulations. She first learned of the need for leave on Sunday, February 2, 1997, and she gave notice to the School District of her need for FMLA leave on Monday morning, which was both within two days and "as soon as practicable" under the facts and circumstances of this case. 29 C.F.R. § 825.303(a) (1999).

■ The School District also argues that the plaintiff's notice was inadequate. First, it complains that the plaintiff did not request leave on the proper form. Although the plaintiff did not request leave on the defendant's usual leave request form, she did so because no leave request forms were available. The regulations provide:

An employer may also require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave. For example, an employer may require that written notice set forth the reasons for the requested leave, the anticipated duration of the leave, and the anticipated start of the leave. However, failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice

29 C.F.R. § 825.302(d) (1999). The plaintiff, in her written and oral leave requests, communicated to the defendant all of the information required on the leave request forms, but even if she had failed to do so, her failure would not have permitted the School District to deny her request for leave. *Id.*

The School District also argues that the plaintiff's notice was inadequate because it did not give adequate notice of the facts supporting her request for leave, and in particular, in the words of the School District superintendent, because the plaintiff gave "no indication in the original request that she was even requesting family medical leave. You have to request those types of things." (Ex. T.) This position is without merit.

■ The regulations provide that an "employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303(b) (1999). Thus, an employee seeking FMLA leave for unforeseen medical treatment is not, when notifying her employer of her need for leave, required to expressly invoke the language of the statute to gain its protection. *See Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762, 764 (5th Cir.1995); *see also Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir.1998) (employee need not mention FMLA by name); *Stoops v. One Call Communications, Inc.*, 141 F.3d 309, 312 (7th Cir.1998) (employee can be completely ignorant of the Act); *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 335 n. 17 (5th Cir.1997) (employee does not have to invoke the statute directly).

■ Also, it is clear that an FMLA notice is sufficient so long as it provides the employer with enough information to put the employer on notice that FMLA qualifying leave is needed for a serious health condition. *Manuel*, 66 F.3d at 762; *see Brohm*, 149 F.3d at 523 (information im-

parted to employer must apprise employer of serious health condition); *Stoops,* 141 F.3d at 312 (employee must put employer on notice that FMLA qualifying leave is needed); *Gay v. Gilman Paper Co.,* 125 F.3d 1432, 1436 (11th Cir.1997) (must give notice of "potentially FMLA—qualifying reason"); *Price v. Marathon Cheese Corp.,* 119 F.3d at 335 n. 17 (same as *Manuel*); *Price v. City of Ft. Wayne,* 117 F.3d 1022, 1025–26 (7th Cir.1997) (same as *Manuel*); *but see Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 977, 980 (5th Cir.) (notice must reasonably apprise employer of serious health condition; employer not required to be clairvoyant) *cert. denied,* —— U.S. ——, 119 S.Ct. 72, 142 L.Ed.2d 57 (1998).

In *Price v. City of Ft. Wayne,* 117 F.3d at 1025–26, the Seventh Circuit held that a leave request form which indicated that there was a medical need for the leave, together with a doctor's note requiring the employee to take time off, "was sufficient information to put [the employer] on notice that this was a possible FMLA leave situation," and that it was then the employer's responsibility to inquire further. *See Uema v. Nippon Express Hawaii, Inc.,* 26 F.Supp.2d 1241, 1247 (D.Hawai'i 1998) (in all circumstances it is employer's duty to classify requested leave as FMLA-qualifying or not).

■ In the present case, before the plaintiff took any leave she gave the School District a written request for leave that specifically invoked the FMLA. Rather than inquire further, as was its obligation, the School District simply denied the request. That same day, the plaintiff verbally provided the School District with full details of her mother's condition, but the School District did not change its position or request further information. On the next morning, the first day of her requested leave, the plaintiff faxed to the School District a note from her mother's doctor that stated that her mother was "having medical problems" and that the plaintiff's help was needed. (Ex. B.) Again, the School District did not change its position.

The court finds that, under all of these circumstances, the plaintiff fully complied with the notice requirements of the FMLA.

### B. Did the Plaintiff's Mother Suffer from a Serious Health Condition?

The FMLA is intended to "balance the demands of the workplace with the needs for families" and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1) & (2) (West 1999). "The FMLA was enacted to help working men and women balance the conflicting demands of work and personal life. It does so by recognizing that there will be times in a person's life when that person is incapable of performing her duties for medical reasons." *Price v. City of Fort Wayne,* 117 F.3d at 1024. To achieve these purposes, Congress sought to give more job security to employees who encounter serious health conditions. *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir.1998).

■ A "serious health condition" is any physical or mental condition that involves inpatient care or continuing treatment by a health care provider. 29 U.S.C. § 2611(11) (West 1999). In the present case, because the plaintiff's mother did not receive inpatient care after her fall, the FMLA only applies if she was receiving continuing medical treatment. Under the governing regulations, "a serious health condition" involving "continuing treatment" contemplates incapacity due to any of the following: a period of incapacity of more than three consecutive days together with subsequent multiple treatments or related periods of incapacity; a period of incapacity due to pregnancy or for prenatal care; a period of incapacity or treatment for the incapacity due to a chronic serious health condition; a permanent or long-term period of incapacity due to ineffective treatment; or a period of absence to receive or recover from multiple treatments by a health care provider for restor-

ative surgery or for a condition likely to result in incapacity if no treatment is received. 29 C.F.R. § 825.114(a) (1999). A serious health condition does not have to result from a single, discrete illness, but can arise from several different and seemingly unrelated illnesses all afflicting a single individual at the same time. *Price v. City of Fort Wayne,* 117 F.3d at 1024–25. However, courts applying the FMLA have all expressly or impliedly required a showing of incapacity before finding a serious health condition. *See Martyszenko v. Safeway, Inc.,* 120 F.3d 120, 123 (8th Cir. 1997) (alleged molestation of child who appeared to have no psychological disorders did not result in serious health condition); *Beal v. Rubbermaid Commercial Products Inc.,* 972 F.Supp. 1216, 1225 (S.D.Iowa 1997) ("bronchitis not a serious health condition where no incapacity"); *Boyce v. New York City Mission Soc'y,* 963 F.Supp. 290, 299 (S.D.N.Y.1997) (recognizing the requirement of incapacity; holding plaintiff's shortness of breath and chest pains failed to meet the FMLA standard); *Rhoads v. FDIC,* 956 F.Supp. 1239, 1255 (D.Md.1997) (denying employer's summary judgment motion where the plaintiff's "well documented chronic health condition" caused "episodic periods of incapacity"); *Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028, 1036–37 (M.D.Tenn.1995) (holding employee's condition did not require FMLA leave because she was not " 'incapacitated' for more than three calendar days," but employee's daughter's fever qualified because it kept her from day care); *Seidle v. Provident Mut. Life Ins. Co.,* 871 F.Supp. 238, 243 (E.D.Pa.1994) (requiring employee to demonstrate her child underwent a "period of incapacity requiring absence from his day care center for *more than* three days").

■ In the present case, when the plaintiff requested FMLA leave from the School District, her mother was in a period of incapacity of more than three consecutive days, with multiple treatments and related periods of incapacity. Her mother's fall, coupled with her existing ailments, incapacitated her for more than three days, leaving her unable to care for her own basic needs, and the plaintiff left work for four days in order to provide care for her mother. *See Beal,* 972 F.Supp. at 1226 ("Time off to care for a family member is allowed when a family member with a serious health condition is unable to care for his or her own basic needs.") *citing Brown v. J.C. Penney Corp.,* 924 F.Supp. 1158, 1163 (S.D.Fla.1996). Her mother was also in a period of incapacity, and treatment for incapacity, due to a collection of chronic, serious health conditions. Thus, on both of these grounds the plaintiff has established that a serious medical condition incapacitated her mother sufficiently for there to be coverage under the FMLA.

## C. Did The Plaintiff Prove That The Defendant Retaliated Against Her Because She Took FMLA Leave?

■ The FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1) (West 1999). Once a party has demonstrated by a preponderance of the evidence entitlement to disputed FMLA leave, then the party's employer is liable for any deprivation of the right to take that leave. *King v. Preferred Technical Group,* 166 F.3d 887, 890 (7th Cir. 1999). The employer's intent is irrelevant. *Id.,* citing *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 713 (7th Cir.1997) and *Hodgens,* 144 F.3d at 159.

Under the FMLA, § 29 U.S.C. 2615(a)(2) (West 1999), an employee has a cause of action against an employer who discriminates or retaliates against him or her for "opposing any practice made unlawful" by the Act. To show discrimination or retaliation, the plaintiff must show that she engaged in protected activity, that the employer took adverse action against her, and that the adverse action was causally connected to the plaintiff's protected activity. *Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir.1998), citing

*Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989). For the plaintiff to establish that the School District retaliated against her for taking FMLA leave, she must either prove retaliation by direct evidence or she must successfully navigate the *McDonnell Douglas/Burdine* analysis. *Hodgens*, 144 F.3d at 160, citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ On this record, the plaintiff has established retaliation by direct evidence. *See Cline*, 144 F.3d at 302 (retaliation established by direct evidence). Based on the findings of the court, the plaintiff was, as a matter of law, engaged in protected activity (taking FMLA—protected leave); her employer took adverse action against her (she was suspended and deductions were made from her wages); and the adverse action was causally connected to the plaintiff's protected activity. In fact, the School District does not really deny disciplining the plaintiff for taking leave—instead, it argues that it was justified in doing so because the leave was unauthorized. Since the court has found that the plaintiff was entitled to take this leave under the FMLA, both the suspension and the wage deduction were unlawful. 29 U.S.C. § 2615(a)(1) (West 1999).

### D. Did the Failure of the Plaintiff to Follow the Grievance Procedure in the Collective Bargaining Agreement Deprive this Court of Jurisdiction under the FMLA Claim?

The School District and the local union, the Northwood–Kensett Education Association ("NKEA"), entered into a collective bargaining agreement ("CBA") effective July 1, 1996 to July 1, 1997. The CBA incorporated by reference the provisions of the FMLA, (*see* Att. A. Art. VIII. § 8.8), with the following qualification: "Incorporating [the FMLA] into the contract will in no way replace, reduce, or change any articles in this agreement." *Id.* The CBA also contained provisions for the resolution of grievances.[7] (Att.A. Art. III. § 3.3.) The fourth step of the grievance procedure provided for impartial, binding arbitration.[8] *Id.* The School District contends that because the plaintiff did not exhaust her remedies under the grievance procedures in the CBA, she cannot now bring a claim under the FMLA.

The Supreme Court, in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 59–60, 94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974), held that arbitration procedures under a collective bargaining agreement do not preclude a civil remedy under Title VII. *See Varner v. National Super Markets, Inc.*, 94 F.3d 1209, 1213 (8th Cir.1996), *cert. denied*, 519 U.S. 1110, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997). The Supreme Court reasoned that "there can be no prospective waiver of an employee's rights under Title VII." *Gardner–Denver*, 415 U.S. at 51, 94 S.Ct. at 1021. The Court, citing *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), also held that "[I]f an arbitral decision is based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective-bargaining agreement, the arbitrator has 'exceeded the scope of the submission,' and the award will not be enforced." *Gardner–Denver*, 415 U.S. 36 at 53, 94 S.Ct. at 1022, 39 L.Ed.2d 147.

---

7. Grievances are defined in the CBA as complaints of alleged violations, misinterpretations, or misapplications of the provisions of the CBA. See Att. A. Art. III. § 3.1.

8. The first three steps of the grievance procedure can be initiated and pursued by the teacher. The forth step, arbitration, must be initiated by the union. ("The *Association* may submit, in writing, a request on behalf of the association and the grieving teacher to the Superintendent within thirty (30) school days from receipt of the Step Three answer to enter into such arbitration." (emphasis supplied) (Att.A. Art. III. § 3.3))

In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court distinguished *Gardner–Denver*, holding that federal statutory claims can be subject to individual consensual agreements to arbitrate. The court held that "statutory claims may be the subject of an arbitration agreement enforceable pursuant to the [Federal Arbitration Act]." *Gilmer*, 500 U.S. at 26, 111 S.Ct. at 1652. *See Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 837–38 (8th Cir.1997) (employee signed a separate arbitration agreement.). In *Patterson*, the Eighth Circuit expressed concern with enforcing arbitration under a collective bargaining agreement where the arbitration agreement was obtained by a union that represents the majority's interests rather than the individual's interest. *Id.; see Varner*, 94 F.3d at 1213. Actions of the union, which represents the majority's interests, "binds all the members of the [bargaining] unit, whether they are part of the majority or for that matter even members of the union entitled to vote for union leaders...." *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 362 (7th Cir. 1997). This problems creates "tension between collective representation and individual statutory rights." *Gilmer*, 500 U.S. at 35, 111 S.Ct. at 1657.

The present case is proof that the courts' concerns were well founded. In the CBA negotiated between the local union and the School District, the arbitration phase of the grievance procedure is controlled by the union. Without the union's request for arbitration, the grievance process is over. (*See* Att. A. Art. III. §§ 3.2(B)–3.3.) It takes no great leap to assume that since the local union refused to help the plaintiff at the initial stages of her controversy because she was not a union member, the union would also refuse to request arbitration, leaving her with no further recourse.

9. The Court did not reach the question whether such a waiver would even be enforceable.

Recently, the Supreme Court addressed the question of whether a general arbitration clause in a collective bargaining agreement required an employee to use the arbitration procedures for an alleged violation of the Americans with Disabilities Act. *Wright v. Universal Maritime Svc. Corp.*, —— U.S. ——, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998). The Court held that even when a collective bargaining agreement incorporates a federal statute by reference, "the ultimate question for the arbitrator would be not what the parties have agreed to, but what federal law requires; and that is not a question which should be presumed to be included within the arbitration requirement." *Wright*, —— U.S. at ——, 119 S.Ct. at 396. Waiver of a statutorily protected right must be "clear and unmistakable." *Id.* The Court held that it did not, stating that the collective bargaining agreement at issue in that case did not contain "a clear and unmistakable waiver of the covered employees' rights to a judicial forum for federal claims of employment discrimination," and therefore should not given effect by the court.[9] *Wright*, —— U.S. at ——, 119 S.Ct. at 397.

In the present case, it is not clear that the CBA, by incorporating the FMLA with the qualification that the FMLA "in no way replace[d], reduce[d], or change[d] any articles" in the CBA, constituted an agreement to arbitrate claims under the FMLA. It is clear, however, that the plaintiff did not enter into an individual arbitration agreement (as in *Patterson* ), nor did she waive her right to a judicial forum for her federal claims under the FMLA. It is also clear that the union was not empowered to do so on her behalf in the CBA. Accordingly, the plaintiff was not required to follow the grievance procedures in the CBA before pursuing her rights under the FMLA in federal court.

*Wright*, —— U.S. at ——, 119 S.Ct. at 397.

## IV. CONCLUSION

The plaintiff is hereby awarded actual damages of $971.32, liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii) of an additional $971.32,[10] interest on those amounts, attorneys fees, and costs. The defendant is further ordered to expunge and remove from its records, including the plaintiff's employee file, all references to its disciplinary action against and suspension of the plaintiff for taking leave on February 3, 4, 5, 6, and 7, 1997.

The plaintiff shall submit its claim for attorney fees, together with full documentation and support, by April 2, 1999. The defendant shall file its response to the plaintiff's claim for attorney fees by April 23, 1999.

**IT IS SO ORDERED.**

---

**10.** The court finds that the defendant did not have reasonable grounds for believing that its actions were not a violation of 29 U.S.C. § 2615. *See* 29 U.S.C. § 2617(a)(1)(A)(iii) (West 1999).

1996-1997

NORTHWOOD KENSETT
COMMUNITY SCHOOL

MASTER

CONTRACT

APPENDIX A

EXHIBIT
D

## ARTICLE I: PREAMBLE

The Board of Directors of the Northwood–Kensett Community School District, hereinafter referred to as the "Board", and the Northwood–Kensett Education Association, hereinafter referred to as the "Association", recognize that the aim of the public schools is to provide a quality education program for children and youth of the School District. The parties further recognize that attainment of this educational objective is a joint responsibility of the Board, the Administration and supervisory staff, the professional teaching personnel of the District, the parents of students, and the community at large.

WHEREAS, the parties have reached certain understandings which they desire to confirm in this agreement, it is agreed as follows:

## ARTICLE II: RECOGNITION

2.1 The Board of Directors of the Northwood–Kensett Community School District recognizes the Northwood–Kensett Education Association as the sole and exclusive negotiation agent for all full-time and part-time regularly certified personnel, hereinafter referred to as teachers, except the superintendent, principals, and any other supervisory personnel having the authority to hire, transfer, assign, promote, discharge, evaluate or process grievances of other employees or having the responsibility to make recommendations thereon. Other exclusions from the unit are: bus drivers, custodians, cooks, lunchroom aides, secretaries, garage personnel, and educational aides and all other non-teaching personnel.

## ARTICLE III: GRIEVANCE PROCEDURE

3.1 Definition—a grievance shall mean only a complaint that there has been an alleged violation, misinterpretation, or misapplication of any of the specific provisions of this agreement.

3.2 Clarifications—

A. Every teacher covered by this agreement shall have the right to present grievances in accordance with these procedures.

B. The failure of a teacher (or, in the event of an appeal to arbitration, the Association) to act on any grievance within the prescribed time limits will act as a bar to any further appeal and an administrator's failure to give a decision within the time limits shall permit the grievant to proceed to the next step. The time limits, however, may be extended by mutual agreement.

C. It is agreed that any investigation or other handling or processing of any grievance by the grieving teacher shall be conducted so as to result in no interference with or interruption whatsoever of the instructional program and related work activities of the grieving teacher or of the teaching staff.

D. A teacher may be represented at all pre-arbitration stages of the grievance procedure by himself/herself, or at his/her option, by the Association. The Association representative(s) shall be appointed by the Association.

E. The Association may process a group grievance through all steps of the grievance procedure commencing with Step 1.

3.3 First Step—An attempt shall be made to resolve any grievance in informal, verbal discussion between complainant and his or her principal.

Second Step—Principal—If the grievance cannot be resolved informally, the aggrieved teacher shall file the grievance in writing, and, at a mutually agreeable time, discuss the matter with the principal. The written grievance shall state the nature of the grievance, shall note the specific clause or clauses of the contract, and shall state the remedy requested. The filing of a formal, written grievance at the Second Step

must be within fifteen (15) school days from the date of the occurrence of the event giving rise to the grievance. The principal shall make a decision on the grievance and communicate it in writing to the teacher and the Superintendent within five (5) school days after receipt of the grievance.

Third Step—Superintendent—In the event a grievance has not been satisfactorily resolved at the Second Step, the aggrieved teacher shall file, within five (5) school days of the principal's written decision at the Second Step, a copy of the grievance with the Superintendent. Within seven (7) school days after such written grievance is filed, the aggrieved and Superintendent or his/her designee shall meet to resolve the grievance. The Superintendent or his/her designee shall file an answer within five (5) school days of the Third Step grievance meeting and communicate it in writing to the teacher and the principal.

Fourth Step—Arbitration—If the grievance is not resolved satisfactorily at Step Three, there shall be available a fourth step of impartial, binding arbitration. The Association may submit, in writing, a request on behalf of the Association and the grieving teacher to the Superintendent within thirty (30) school days from receipt of the Step Three answer to enter into such arbitration. The arbitration proceeding shall be conducted by an arbitrator to be selected by the two parties within seven (7) school days after said notice is given. If the two parties fail to reach agreement on an arbitrator within seven (7) school days, the Public Employee Relations Board will be requested to provide a panel of seven (7) arbitrators. Each of the two parties will alternately strike one name at a time from the panel until only one shall remain. The remaining name shall be the arbitrator. The decision of the arbitrator will be binding on the parties. Expenses of the arbitrator's services shall be borne equally by the School District and the Association.

## ARTICLE IV: DUES DEDUCTION

4.1 Authorization—Any teacher who is a member of the Association, or who has applied for membership, may sign and deliver to the board an assignment authorizing payroll deduction of professional dues to the local Association, ISEA, NEA. It shall be the responsibility of the Association to inform members of the system used, and provide the necessary authorization cards for the deduction. Authorization for dues deduction shall end October 1.

4.2 Regular Deduction—Pursuant to the deduction authorization, the Board shall deduct one-ninth ($\frac{1}{9}$) of total dues from the regular salary check of the teacher each month for nine (9) months, beginning in October and ending in June of each year.

D. Workers' Compensation—Each teacher shall be covered by workers' compensation paid for by the Board. Absence due to injury incurred in the course of the teacher's employment shall be charged against the teacher's sick leave days.

E. School Liability—All teachers shall be covered by a school financed liability insurance governing job-related performance of duties which shall include teachers required to use personal automobiles in their assigned duties.

F. Dental Insurance—Dental insurance will be available for each teacher and his/her immediate family members at no cost to the district from July 1 through June 30.

7.2 Coverage—The insurance provided in Article 7.1 A, B, C and F shall be for twelve (12) consecutive months. Each new teacher to the District shall be covered by Board provided insurance no later than the first day of the month following the teacher's first contract workday.

Teachers leaving the District will be covered through August 31 following the school year they terminate their services with the District, except for the Vocational Agriculture teacher who is on an 11 ½ month contract. The Vocational Agriculture teacher will be covered through June 30 of the school year he/she leaves the District.

7.3 Eligibility—All teachers who are contracted to teach a minimum of 50% are eligible for coverage under Article 7.1 A, B, C and F.

7.4 Descriptions—The Board shall provide each new teacher a description of the insurance coverage provided herein within ten (10) days of the beginning of each school year or date of employment, which shall include a clear description of conditions and limits of coverage. The Board will be responsible for providing insurance information in the form of applications and enrollment meetings.

7.5 Continuation—In the event that a teacher, absent because of illness or injury, has exhausted sick leave accrual, the above-mentioned benefits shall continue throughout the balance of the school year.

7.6 The employer reserves the right to change carriers providing the benefits are equal to or greater than those currently provided.

ARTICLE VIII: LEAVES

8.1 Sick Leave—All teachers shall be entitled to fifteen (15) days of sick leave per year. Unused sick leave may accumulate to a maximum of 105 days. The Board reserves the right to require a doctor's certificate as proof of sickness, where evidence might indicate an abuse of this benefit.

8.2 Emergency Leave—Emergency leave days for teachers may total six (6) days per year, but will not accumulate. This leave would be used for the following:

A. Death in the immediate family—Immediate family includes parents, spouse, children, brothers, sisters, grandparents, grandchildren, inlaws of the immediate family, any other member of the immediate household, and personal friend or relative not listed above.

B. Critical illness of parents, spouse, or children.

The employer, at its discretion, may grant additional time if, in the employer's discretion, extraordinary circumstances are determined to exist.

8.3 Business Leave—Each teacher may apply in writing on a form provided by the administration for business leave. Two days per year shall be available; leave days shall be nonaccumulative. Business leave may be used for activities which cannot normally be scheduled during after school hours. This leave is not to be used during the first and last week of school, workshop days and prior to and following holidays and vacation periods. Forty-eight (48) hours notice is to be given except in emergencies. Business leave may be used in one-half day allotments. Teacher has option of converting "business" leave days to personal days. No more than one teacher may be gone from any one building on a particular day for "personal day". The reason for the request shall remain confidential between the employee and administration.

8.4 Jury and Legal Leave—Teachers who are called for jury service will receive the difference between their pay as jurors and their regular daily rate of pay. A teacher called for jury service will notify the employer within twenty-four (24) hours after notice of call to jury duty and suitable proof of jury service pay must be presented to the employer. The teacher will report to work within one (1) hour on any day when he/she is excused from

jury duty during regular working hours.

8.5 Association Leave—Up to four (4) personal days paid leave shall be available for representatives of the Association to attend the Association business.

8.6 Other Leaves—Each teacher may apply in writing to the Superintendent for other leaves with or without pay for good cause as determined by the Superintendent. This is not a substitute for business leave provided in 8.3.

8.7 Illness of Dependent Child—Up to two days per year shall be available to each teacher for the illness of a dependent child. This leave shall only be available in either half-day or full-day allotments. Leave days shall be non-cumulative. The regular half-day or full-day payment for a substitute teacher will be deducted in cases where this leave is utilized whether or not a substitute is actually used.

8.8 The provisions of the Family Medical and Extended Leave Act are hereby incorporated into this agreement by this reference. Incorporating this act into the contract will in no way replace, reduce, or change any articles in this agreement.

## ARTICLE IX: TEACHER HOURS, LOAD AND VACATION

9.1 Teaching Load—

A. Junior/Senior High School—The daily teaching load in the junior/senior high school shall provide one preparation period per day.

B. West Elementary School—The daily teaching load in the west elementary school shall provide one preparation period per day.

C. Elementary Schools—Each elementary teacher shall be provided an average of 45 minutes of preparation time per day per 6-day cycle with exceptions being hall duty ro-

tation and taking students to and from lunchroom.