Penny MORGAN, Plaintiff,

v.

FBL FINANCIAL SERVICES, INC.; FBL Financial Group, Inc.; Iowa Farm Bureau Federation; Tom Eppenauer and Kris Rowe, Defendants.

No. 4–00–CV–20308.

United States District Court,
S.D. Iowa,
Central Division.

Nov. 16, 2001.

Paige E. Fielder, Beth A. Townsend, Fielder & Townsend PLC, Johnston, IA, for plaintiff.

Angela T. Althoff, Morain Burlington Pugh & Koop, West Des Moines, IA, for defendants.

### ORDER ON MOTION FOR SUMMARY JUDGMENT

BREMER, United States Magistrate Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment, (Clerk's No. 9), filed July 6, 2001. Plaintiff, Penny Morgan, asserts claims for sexual discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.2000e—2000e–17 (1994 & West

Supp.1999), and under the Iowa Civil Rights Act, Iowa Code chapter 216 (1999), and for retaliatory discrimination for exercising her rights under the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2611—2654 (1994). The parties consented to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(c).

Defendants—FBL Financial Services, Inc., FBL Financial Group, Inc., Iowa Farm Bureau Federation, Tom Eppenauer and Kris Rowe—move for summary judgment on the basis that Morgan has not made a showing sufficient to establish her claims of sexual discrimination and violation of the FMLA. Defendants assert no genuine issues of material fact remain in dispute, and they are entitled to judgment as a matter of law.

Morgan filed her Resistance on September 10, 2001. A hearing was held on September 25, 2001. This matter is fully submitted.

## I. STANDARD FOR SUMMARY JUDGMENT

A court shall grant a motion for summary judgment only if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must consider the facts and the inferences to be drawn from them in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

To preclude the entry of summary judgment, the nonmovant must make a showing sufficient to establish the existence of every element essential to his case, and on

which he has the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Reed v. ULS Corp.,* 178 F.3d 988, 989 (8th Cir.1999). When a motion is made and supported as required in Federal Rule of Civil Procedure 56(a), the adverse party may not rest upon the mere allegations or denials in his pleadings, but must set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. At the summary judgment stage, the court may not make determinations about the credibility of witnesses or the weight of the evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. MATERIAL FACTS NOT IN DISPUTE

Unless otherwise indicated, the following facts are either undisputed or viewed in the light most favorable to Morgan, the non-moving party.

Morgan, who lives in Fairfield, Iowa, began working for Farm Bureau in 1992 as an office assistant/secretary. Farm Bureau promoted Morgan several times, eventually advancing her to the job of inside claims representative ("inside adjuster"). Morgan earned positive performance reviews as an inside adjuster and throughout her employment at Farm Bureau.

In approximately June 1998, Morgan discussed the possibility for promotion to field claims representative ("field adjuster") with her supervisor, Brad Goff, who managed the claims office in Fairfield. On June 18, 1998, Goff wrote a memorandum to Tom Eppenauer, Farm Bureau's vice president of claims, recommending that Morgan "be offered a field position at the first opportunity."[1] (Pl.'s Ex. R.)

---

**1.** Goff's memorandum stated in full as follows:

Goff was planning to retire. Eppenauer testified in his deposition that Farm Bureau made no decision on whether to promote Morgan to a field-adjuster job, should the company promote a field adjuster to replace Goff, thus creating an opening. (Eppenauer Dep. at 25.) Farm Bureau would, however, consider promoting Morgan if such an opening occurred. Eppenauer stated the reason Farm Bureau could not decide ahead of time to promote Morgan to a field-adjuster vacancy was because, "We have to open" such vacancies to everyone in the company by internally posting the opening to "our entire four-state region." *Id.* Eppenauer had "always done that," recognizing that many Farm Bureau employees want field-adjuster jobs. *Id.* at 21. Only after seeking an inside applicant would the company run a newspaper ad. *Id.* at 25.

On August 31, 1998, Morgan's son, Jacob, was born. He had cystic fibrosis. In November 1998, Jacob received intensive care at the hospital for 12 days. Because of Jacob's medical condition, Morgan requested 12 weeks of leave under the FMLA, which Farm Bureau granted. At the end of February 1999, when her leave ended, Morgan asked Goff for an extension of her leave. After discussing Morgan's request with Eppenauer, Goff told her that Farm Bureau could offer her no more leave at that time.

Before Morgan's leave was over, she again asked Goff for a promotion to field adjuster. She said she needed the extra income to pay for Jacob's care when she returned to work; Jacob's condition precluded regular day care, and he required a nanny, or similar full-time, at-home child care. Morgan's family could not afford such care unless she received more pay. Goff told Morgan that Farm Bureau had no opening for a field adjuster at that time.

In February, Morgan asked Goff how much higher her salary would be as a field adjuster. Goff got this information from Eppenauer, and on February 22, 1999, he told Morgan, that if she were a field adjuster, her pay would exceed her current salary by approximately $282 per month.

After talking with Morgan, Goff sent a memorandum to Eppenauer, stating as follows:

> Spoke to Penny after you and I talked this morning. Told her the approx [sic] increase in her pay of $282 mo[nth]. She would like to see this work out. She and Dennis are going to talk this over and she just may be back March first.
>
> I told her if my replacement was not made from [Fairfield] there may not be a place for her in the field. And even if my replacement was named from [Fairfield] it may be that she would have to interview for the position.
>
> At any rate, she said she may be in the office March 1, if for no other reason tha[n] to keep her job chances open and Dennis would take some family leave from his job.

Pl.'s Ex. 5. Eppenauer forwarded Goff's message to Noel McKibbin, assistant claims manager and vice president of litigated claims. According to Eppenauer, Goff told him that Morgan had said, "that's not anywhere near the money I thought it

---

I anticipate this will be my last evaluation of Penny. Just want you to know she is an excellent adjuster that deserves to be offered a field position at the first opportunity. She is bright, knowledgeable and has a good work ethic. She performs well under pressure and needs little "hands on" supervision. She is a self starter as well and she is able to work well with others. She is a team player. She is an asset to Farm Bureau.

Pl.'s Ex. 4.

would be. I can't make it on that anyway," (Eppenauer Dep. at 20), and that she was "not interested" in the job, (Eppenauer Dep. at 24). Eppenauer stated he presumed Morgan had no desire to continue seeking a field-adjuster job. Goff stated that Morgan led him to believe that $282 might not be sufficient, and she was going to discuss the matter with her husband. Goff did not believe that Morgan considered $282 absolutely insufficient. Goff believed Morgan wanted the promotion and wanted it to work out for her family.

Morgan testified that, although she told Goff she had thought the salary increase associated with the field-adjuster job would be more than $282 per month, she never indicated to Goff that $282 was insufficient. She noted that the promotion would include other benefits such as use of a car. Morgan asked Goff to notify her if a job paying more than her current salary opened; she wanted to be considered for such a job. Goff stated that he discussed Morgan's promotion request with his manager, Daniel Schneider, and with McKibbin. Goff told Morgan that no field-adjuster job was available then, and the company could not create such a position.

On February 23 or 24, 1999, Goff learned that Kris Rowe, a technical-specialist claims adjuster with Farm Bureau's Iowa City office, would be replacing him, and he discussed the matter with Morgan on February 24. Goff told Morgan that if she did not return to work on March 1, 1999, after her leave expired, the company would fire her. Morgan expressed hope that there might be a field-adjuster opening in Iowa City when Rowe was replaced there. Goff informed Eppenauer and Schneider of Morgan's interest in applying for a field-adjuster job in Iowa City.

On March 1, 1999, Morgan returned to work at Farm Bureau. She again requested, and was denied, a promotion to a job as field adjuster. She resigned that day. Douglas Heschke, a field adjuster who worked with Morgan, stated it was "pretty much common knowledge" in the office that the only way she could afford to stay was if she received a promotion. Morgan's resignation letter to Goff stated as follows:

> Because of the continued fragile health of my son, I find I am unable to continue my full-time duties as claim service representative for Farm Bureau. I must therefore give my resignation.
>
> Both challenging and rewarding, I have always enjoyed my position. I have taken pride in doing my personal best to assist the insured as well as meeting the company expectations. I also have a great amount of respect for each of my co-workers and believe I have learned a great deal from them.
>
> My hope is that in the future should the company find there to be an opening and the circumstances under which I am resigning have changed, I might be given consideration to resume employment with Farm Bureau.

Pl.'s Ex. 1. After she quit, Morgan indicated to Goff her desire to be rehired, and stated that if a field-adjuster job came open, she would be very interested in returning. Goff retired from Farm Bureau soon after Morgan resigned, and Kris Rowe replaced him. Goff testified in his deposition that he probably told Eppenauer and Rowe that Morgan wanted to return to Farm Bureau if a field-adjuster job opened. (Goff Dep. at 46–47.) Rowe testified that although Goff showed him Morgan's resignation letter, Goff never told him Morgan wanted the field-adjuster job. Morgan herself never told Rowe that she wanted a field-adjuster job with Farm Bureau.

To fill Morgan's vacant inside-adjuster job, the company published a newspaper

ad seeking applicants. The company considered the top two applicants to be Scott Menster and Jane Ferguson, both of whom had prior adjusting experience. Menster had not worked for Farm Bureau before. Rowe testified that, like Menster, Ferguson was well qualified. According to Rowe, "if neither one of those two would accept the position as an inside adjuster, we would have to go back to our pool of prior applicants, which were not qualified, or make the change from an inside position to a field position." (Rowe Dep. at 30.) Farm Bureau offered the inside-adjuster job to Menster, who declined the offer. Menster stated, however, that he would accept an offer of a field-adjuster job.

Qualifications for the field-adjuster job included a preference for a college degree, which Menster had. Farm Bureau had, however, promoted to field adjuster people without a college degree who had worked for the company first as secretaries, and then as inside adjusters. Menster also had experience in working as a field adjuster for another company.

Without posting internally the job of field adjuster, and without placing a newspaper ad, Farm Bureau offered Menster a field job on approximately May 1, 1999. The record indicates that Farm Bureau never offered the inside-adjuster job to Ferguson. (Rowe Dep. at 30–31.) Menster's new job combined Morgan's duties as inside adjuster with the duties of a field adjuster.

Eppenauer stated he did not tell Morgan about the field-adjuster opening because he believed she had rejected the opportunity before she resigned, and because she had not advised Farm Bureau that circumstances in her personal life had changed. Eppenauer stated he interpreted the phrase, "circumstances under which I am resigning have changed," in Morgan's resignation letter to mean circumstances in Morgan's personal life rather than the fact that the company told her no field jobs were available. (Eppenauer Dep. at 42–43.) Eppenauer contends Farm Bureau would have interviewed Morgan and considered her for the opening, if her resignation letter had made clear that the changed circumstances to which the letter referred included the company's telling her it had no job opening for a field adjuster. Both Eppenauer and Goff considered Morgan to be fully qualified for the job of field adjuster.

Goff testified that the company could have created a field job for Morgan as it did for Menster. (Goff Dep. at 43.) Goff said Eppenauer had the power to create such a position. Eppenauer testified that the company could have created a job combining field-adjuster and inside-adjuster duties before it did so for Menster.

## III.  ANALYSIS

### A.  Counts I & II—Sexual–Discrimination Claims

Defendants contend they are entitled to summary judgment in that Morgan has not made a showing sufficient to establish her prima facie claim of sexual discrimination or to show her employer's explanation for its actions was a pretext for unlawful discrimination.

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Similarly, the ICRA makes it unlawful for an employer "to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the age, race, creed, color, sex,

national origin, religion, or disability ...." Iowa Code § 216.6. Iowa courts apply Title VII analysis to discrimination claims brought under the ICRA, and the Court will do so here. *See Lynch v. City of Des Moines*, 454 N.W.2d 827, 833 (Iowa 1990).

■ The three-stage burden-shifting analysis set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) governs Morgan's sexual discrimination claims, because her claims are based on inferences to be drawn from circumstantial evidence. *McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817; *see also McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1126 (8th Cir.1998); *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1332 (8th Cir.1996). Under *McDonnell Douglas*, "the plaintiff bears the burden of establishing a prima facie case of discrimination, which has the effect of creating a legal presumption of unlawful discrimination." *Ghane v. West*, 148 F.3d 979, 981 (8th Cir.1998). If the plaintiff establishes a prima facie case, then the defendant bears the burden of offering a legitimate nondiscriminatory reason for the adverse employment action. *Id.* If the defendant meets this burden, the presumption created by the prima facie case is rebutted, and the burden then shifts back to the plaintiff to show the employer's nondiscriminatory reason for the employment action was a pretext for the alleged unlawful discrimination. *Id.; accord Erickson v. Farmland Ind., Inc.*, 271 F.3d 718, 725–26 (8th Cir.2001) (stating plaintiff must present sufficient evidence to (1) raise a question of fact as to whether defendant's proffered reason was pretextual *"and* (2) create a reasonable inference that age was a determinative factor in the decision to demote him") (emphasis in original); *Cronquist v. City of Minneapolis*, 237 F.3d 920, 924 (8th Cir.2001).

■ Evidence of a prima facie case may present a factual issue on pretext. *Erickson*, 271 F.3d at 726 (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir.1999) (en banc)). Instances of disparate treatment of similarly situated persons can also support a pretext claim. *See id.* at 727–28 (quotations and citation omitted); *Bogren v. Minnesota*, 236 F.3d 399, 404–05 (8th Cir.2000).

### 1. Failure to Promote

■ To establish her prima facie claim of disparate treatment, Plaintiff must prove that, "she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see McCullough*, 140 F.3d at 1126. Specifically, the plaintiff must show that (1) she is a member of a protected group, (2) she was qualified and applied for a promotion to an available position, (3) she was rejected, and (4) similarly situated employees, not part of the protected group, were promoted instead. *See McCullough*, 140 F.3d at 1126 (Title VII claim); *Ramirez v. Iowa Dep't of Transp.*, 546 N.W.2d 629, 632 (Iowa Ct.App.1996) (ICRA claim).

Defendants challenge the second element of Morgan's prima facie claim. Defendants argue that when Morgan applied for a promotion to field adjuster, no such job was available, and later, when the position became available, Morgan did not apply.

■ Formal application for a job opening is not required to establish a prima facie case of discrimination, if the job opening was not officially posted or advertised and either (1) the plaintiff had no knowledge of the job from other sources until it was filled, or (2) the employer was

aware of the plaintiff's interest in the job notwithstanding the plaintiff's failure to make a formal application. *Gentry v. Georgia–Pacific Corp.*, 250 F.3d 646, 652 (8th Cir.2001); *Chambers v. Wynne School Dist.*, 909 F.2d 1214, 1217 (8th Cir.1990). It is undisputed that Farm Bureau did not officially post or advertise the opening for field adjuster before hiring Menster, and that Morgan had no knowledge of the job from other sources until it was filled. Morgan therefore need not show she formally applied when the field job became available.

■ Viewing the record in the light most favorable to Morgan, the Court holds she has produced sufficient evidence to raise fact questions concerning the second element of her prima facie case. The fact questions include, but are not limited to, whether Defendants could have upgraded Morgan's job to a field position before she resigned, as they did for Menster in April 1999; whether Defendants had a field job opening before Morgan resigned; whether Eppenauer and Rowe knew Morgan was still interested in applying for a field job in April 1999; and Defendants' reason for failing to internally post or advertise the field-adjuster vacancy created in April 1999.

■ Defendants next challenge the fourth element of Morgan's prima facie claim by asserting that Morgan and Menster were not similarly situated, in that Menster had a college degree and three years of experience as a field adjuster, thus making him more qualified than Morgan for Farm Bureau's field-adjuster opening. The job for which Menster was hired, however, blended the duties of a field adjuster with the duties of an inside adjuster. The record does not indicate Menster had significant, if any, experience as an inside adjuster. Morgan, on the other hand, had years of experience working as an inside adjuster, and she had received positive performance reviews in that position and throughout her tenure at Farm Bureau. The record does not show how many positive performance reviews Menster had received before applying to work for Farm Bureau. Morgan's experience with Farm Bureau gave her significantly more knowledge of the company, its policies and employees than Menster had. Both Goff and Eppenauer stated that Morgan was qualified for the job for which Menster was hired. Eppenauer said he would have considered Morgan for the job if he had known she was interested in it. Viewing the facts and inferences in the light most favorable to Morgan, the Court holds that Morgan has established a genuine issue of material fact concerning whether she and Menster were similarly situated on relevant qualifications for the job that the company gave Menster.

■ The burden shifts to Defendants to proffer a legitimate, non-discriminatory justification for its acts. To satisfy this burden, Defendants restate their arguments challenging Morgan's prima facie case. Defendants contend that in February and March 1999, Farm Bureau had no openings for a field adjuster; in April 1999, when such a job opened, Morgan did not apply; and Menster was not similarly situated to Morgan, because Menster had approximately three years of experience as a field adjuster and he had a bachelor's degree. These articulated reasons constitute a facially nondiscriminatory reason for Defendants' employment decision. *See McCullough*, 140 F.3d at 1127.

■ The burden shifts to Morgan to present evidence sufficient to create (1) a fact issue as to whether Defendants' proffered reasons are mere pretext, and (2) a reasonable inference that the adverse employment decision was an act of intentional

gender discrimination. *See id.* The ultimate fact of discrimination may be inferred from the falsity of the employer's explanation, "particularly if disbelief is accompanied by a suspicion of mendacity." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

Defendants argue that Morgan has pointed to no evidence to support a reasonable inference that Defendants unlawfully discriminated against her.

As noted above, Morgan has offered evidence rebutting Defendants' evidence that Farm Bureau had no field openings available in the relevant period before Morgan resigned, that Defendants were unaware of Morgan's interest in applying for a field job in April 1999, and that Morgan and Menster were not similarly situated. As further evidence of pretext, Morgan points to Defendants' disparate treatment of her: When Menster said he did not want the inside-adjuster job but wanted a field-adjuster position, the company changed the opening from an inside-adjuster job to a field-adjuster job and hired Menster without posting the new opening, actions that Defendants refused to take for Morgan.

Eppenauer stated the reason Farm Bureau could not promise to promote Morgan to a future field-adjuster vacancy was because company policy required internally posting the opening to a four-state region, thus giving all employees a chance to apply. Eppenauer said the company had always followed this policy, because many Farm Bureau employees want field-adjuster jobs. Contrary to Eppenauer's explanation, the company hired Menster as a field adjuster without internally posting, or otherwise advertising, the opening.

Rowe indicated that if neither Menster nor Jane Ferguson accepted the inside-adjuster job offer in April 1999, he planned to change the inside position to a field position, because the remaining applicants for the inside job were unqualified. (Rowe Dep. at 30.) But when Menster declined the inside-adjuster job offer and sought a field-adjuster position, Rowe changed the opening to a field position and offered it to Menster without first offering the inside-adjuster job to Ferguson. (Rowe Dep. at 30–31.)

The discrepancy between Rowe's and Eppenauer's statements and actions are sufficient to raise a "suspicion of mendacity." *See Reeves,* 530 U.S. at 147, 120 S.Ct. 2097. This, together with the evidence showing Defendants' proffered reasons were mere pretext, and the evidence supporting Morgan's prima facie claim, support a reasonable inference that Defendants unlawfully discriminated against Morgan. *See Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *McCullough,* 140 F.3d at 1128.

Viewing the evidence as a whole and in the light most favorable to Morgan, the Court finds that genuine issues of material fact exist, thus precluding summary judgment. The Court denies Defendants' Motion for Summary Judgment regarding the Title VII and ICRA claims of sexual discrimination through disparate treatment.

### 2. Constructive Discharge

Morgan asserts a reasonable person in her position would have found continued employment under conditions created by Defendants to be intolerable, and Defendants either intended to force her to resign or could have reasonably foreseen that she would resign as a result of their actions.

Constructive discharge occurs when "an employer deliberately renders the employee's working conditions intolerable" and thus forces her to quit her job. *Parrish v. Immanuel Medical Center,* 92

F.3d 727, 732 (8th Cir.1996) (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981)). To prove she was constructively discharged, a plaintiff must show more than just a Title VII violation by her employer. *Willis v. Henderson*, 262 F.3d 801, 809 (8th Cir.2001). A plaintiff must show that a reasonable person in her situation would find the workplace conditions intolerable, with intolerability judged by an objective standard. *Parrish*, 92 F.3d at 732; *Hukkanen v. International Union of Operating Eng'rs*, 3 F.3d 281, 284 (8th Cir.1993). To constitute constructive discharge, the employer's actions must have been intended to force the employee to quit. *Parrish*, 92 F.3d at 732. A plaintiff may satisfy this intent requirement by showing her resignation was a reasonably foreseeable consequence of her employer's discriminatory actions. *Id.*

Here, Morgan asserts her working conditions became intolerable after her son was born and diagnosed with cystic fibrosis. She could no longer afford to work at the salary she made as an inside adjuster. Morgan does not claim her salary or any other working condition changed. The change that made Morgan's working conditions allegedly intolerable, the birth of a child with cystic fibrosis and the resultant need for a significantly higher salary, cannot be reasonably attributed to Defendants' intentional acts to deliberately render Morgan's working conditions intolerable.

Viewing the facts and inferences in the light most favorable to Morgan, the Court holds the record contains insufficient evidence to support a finding that Defendants deliberately made Morgan's working conditions intolerable. Defendants are entitled to summary judgment on the Title VII and ICRA claims of sexual discrimination through constructive discharge.

### 3. Retaliation and Hostile Work Environment

██ Defendants also argue that the record does not support a sexual-discrimination claim based on retaliation or creation of a hostile work environment. Plaintiff does not resist Defendants' arguments, and she states that she has no harassment claim. To establish a prima facie case of retaliation discrimination based on failure to promote, a plaintiff must show the following: (1) The plaintiff engaged in statutorily protected activity; (2) she was qualified and applied for a promotion to a position for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) this adverse employment action occurred because the plaintiff engaged in statutorily protected activity. *See Howard v. Burns Bros., Inc.*, 149 F.3d 835, 841 (8th Cir.1998); *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1245 (8th Cir.1998); *Lyoch v. Anheuser–Busch Companies, Inc.*, 139 F.3d 612, 614 (8th Cir.1998) (quoting *Marzec v. Marsh*, 990 F.2d 393, 395–96 (8th Cir.1993)). The record contains insufficient evidence to generate a factual issue concerning whether Morgan engaged in activity statutorily protected under Title VII or the ICRA.

For these reasons, the Court dismisses any claim for sexual discrimination based on retaliation or hostile work environment.

### B. Count III—FMLA Claim

Morgan asserts that Defendants violated her rights under the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–2654 (1994), by not promoting her to a field-adjuster position in retaliation for her taking FMLA leave. Defendants concede that Morgan engaged in protected activity by taking FMLA leave. But they argue that they did not interfere with her rights. They contend they had a legitimate ratio-

nale for not promoting her, because initially no field-adjuster job was open, and later Morgan did not indicate her interest in the position. Furthermore, Defendants assert, they did not take any adverse or retaliatory action against her while she was engaged in protected activity, because Defendants made no promotion decision affecting Morgan while she was on leave.

Congress made it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1); *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir.2001). Morgan states an employer is prohibited from considering the taking of FMLA leave as a negative factor in employment actions such as hiring, promotions or disciplinary actions. She cites 29 C.F.R. § 825.220(c) (employer's use of "the taking of FMLA leave as a negative factor in employment actions" violates FMLA).

The parties contend that the Court should apply *McDonnell Douglas'* shifting burden-of-production analysis to analyzing this claim. *See McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817. Defendants cite *Ozolins v. Northwood–Kensett Comm. Sch. Dist.*, 40 F.Supp.2d 1055, 1065–66 (N.D.Iowa 1999) in support of their contention. *See Ozolins*, 40 F.Supp.2d at 1066 (holding that to establish School District retaliated against plaintiff for taking FMLA leave, plaintiff had to either prove retaliation by direct evidence or had to successfully navigate *McDonnell Douglas* analysis) (citing *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998)).

▇▇ Recently, however, the Eighth Circuit rejected the contention that FMLA substantive claims should be analyzed under the *McDonnell Douglas* burden-shifting scheme, leaving open the question of whether the burden-shifting analysis is appropriate for claims under § 2615(b), FMLA's anti-retaliation provision. *See Rankin v. Seagate Technologies, Inc.*, 246 F.3d 1145, 1148 (8th Cir.2001) (holding fired plaintiff's absences were attributable to "serious health condition," and therefore FMLA was implicated and protected her against disciplinary action based on her absences; "[a]pplying rules designed for anti-discrimination laws to statutes creating substantive entitlements is apt to confuse") (quoting *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 712 (7th Cir.1997) (declining to apply *McDonnell Douglas* analysis to plaintiff's claim he was improperly denied leave when he was fired)). Citing *Rankin* and *Diaz*, the Ninth Circuit held that a claim alleging an employer used the "taking of FMLA leave as a negative factor in employment actions," 29 C.F.R. § 825.220(c), was a claim of a substantive right, pertaining to the "interference with the exercise of rights" provision of section 2615(a)(1), rather than to section 2615(a)(2) (prohibiting "discrimina[tion] against any individual for opposing any practice made unlawful by the subchapter") or section 2615(b) (prohibiting discrimination against any individual for instituting or participating in FMLA proceedings or inquiries). *Bachelder*, 259 F.3d at 1124 (alteration in cited case). The court therefore declined to use the *McDonnell Douglas* approach, and held that to prevail on her claim, the plaintiff "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her." *Id.* at 1125. The analysis the Eighth Circuit would use to decide Morgan's claim is unclear. The Court need not decide the issue, however, because the result is the same whether the Court uses the *McDonnell Douglas* burden-shifting scheme or

the preponderance-of-the-evidence analysis used in *Bachelder*. Under the *McDonnell Douglas* scheme, the reasoning and result is substantially the same as discussed above under Counts I and II. The same evidence that generates genuine issues of material fact under the *McDonnell Douglas* analysis also generates genuine issues of material fact under the preponderance-of-the-evidence test.

Viewing the record in the light most favorable to Morgan, the Court holds she has produced sufficient evidence to raise fact questions concerning whether her taking of FMLA-protected leave constituted a negative factor in the decision to not promote her. Defendants are not entitled to summary judgment on the claim of discrimination under the FMLA.

## IV. CONCLUSION

Concerning Defendants' Motion for Summary Judgment, (Clerk's No. 9), the Court rules as follows:

Because genuine issues of material fact remain to be determined at trial, the Court **denies** the Motion with respect to the claims for sexual discrimination based on disparate treatment. (Counts I and II).

The Court **grants** the Motion with respect to (1) the claims for sexual discrimination based on constructive discharge, because insufficient evidence exists to support a finding that Defendants deliberately rendered Plaintiff's working conditions intolerable, (2) any claims for sexual discrimination based on retaliation, because the record contains insufficient evidence to support a finding that Plaintiff engaged in an activity protected under Title VII or the ICRA, and (3) any claims for sexual discrimination based on a hostile work environment, because Plaintiff states she is not alleging hostile-work-environment discrimination. (Counts I and II.)

Because genuine issues of material fact remain to be determined at trial, the Court **denies** the Motion with respect to the claims for violation of the FMLA based on retaliation for taking FMLA-protected leave. (Count III.)

The Final Pretrial Conference set for November 19, 2001, at 9:30 a.m., will be conducted by the Honorable Ross A. Walters, Room 440, U.S. District Court. Trial remains set for December 3, 2001, at 9:00 a.m.

IT IS SO ORDERED.