# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 04-3049/3187

_____

Nolan Richardson, Jr.,         *

          *

      Plaintiff/Appellant/     *

      Cross-Appellee,       *

          *

   v.           *

          *

B. Alan Sugg, President, University   *    Appeal from the United States

of Arkansas, in his official and his   *    District Court for the

individual capacities; John White,   *    Eastern District of Arkansas.

Chancellor, University of Arkansas,   *

Fayetteville, in his official and his   *

individual capacities; J. Frank Broyles,   *

Athletic Director, University of   *

Arkansas, Fayetteville, in his official   *

and his individual capacities,       *

          *

      Defendants/Appellees/   *

      Cross-Appellants,     *

          *

Razorback Foundation, Inc.,      *

          *

      Defendant,        *

          *

University of Arkansas Board of     *

Trustees,          *

          *

      Defendant/Appellee/    *

      Cross-Appellant.     *

          *

_____

Submitted: November 17, 2005
Filed: May 26, 2006
_____

Before ARNOLD, BEAM, and RILEY, Circuit Judges.
_____

BEAM, Circuit Judge.

Nolan Richardson, Jr., appeals the district court's[1] dismissal, following a bench trial, of his race-discrimination and free-speech claims arising out of his termination as the men's head basketball coach for the University of Arkansas-Fayetteville (UAF) Razorbacks. Richardson brought suit against B. Alan Sugg, President of the University of Arkansas; John White, Jr., Chancellor of UAF; J. Frank Broyles, Athletic Director of UAF; and the University of Arkansas Board of Trustees ("Defendants").[2] Defendants cross-appeal the district court's decision that a claims-release clause in Richardson's October 2000 employment contract applied only to claims accrued up to the date of execution of the agreement, and not to prospective claims. We affirm.

## I. BACKGROUND

Richardson had a basketball coaching career with UAF that spanned seventeen years and spawned an impressive record of NCAA playoff and championship appearances, and one national championship. He was hired as the Razorbacks' head

---

[1]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

[2]Richardson also brought suit against the Razorback Foundation, Inc. The district court dismissed the Foundation and it is not a party on appeal.

men's basketball coach in 1985. Broyles, a Caucasian, hired Richardson, who became the first black head coach in UAF history. Broyles had been at UAF since 1958, starting as the head football coach and eventually becoming the athletic director. White, also a Caucasian, has been UAF's chancellor since 1997 and reports to Sugg. Sugg, a Caucasian, has been the university's president since 1990 and reports to the university's board of trustees.

The events leading to this appeal occurred principally in 2000 and after. In October 2000, Richardson executed a new employment contract (Contract) with the University of Arkansas, and a Personal Services and Guaranty Agreement (Guaranty) with the Razorback Foundation, Inc. (Foundation). The execution of these compacts followed the airing of a number of issues between Richardson and Broyles over the years, including control over shoes and apparel and the contracting process for such (1998); Nolan's hiring of his son, Nolan Richardson III, as an assistant basketball coach (1998); the nature of Richardson's appointment as an assistant athletic director (1999); and alleged pay disparity between football assistant coaches and basketball assistant coaches (1997 and 2000). The record is replete, however, with correspondence from Broyles, White, and Sugg supporting and encouraging Richardson in his run up to making the Razorbacks national champions in 1994, as well as during the years following, when the team fell short of recapturing that same glory.

On February 23, 2002, the Razorbacks lost to Kentucky at Kentucky, 58-71, near the end of a season where the Razorbacks went 14-15. At a post-game press conference, Richardson was asked what he and Kentucky coach Tubby Smith discussed on the floor prior to tip-off. Richardson replied that the two acknowledged the pressures they felt to win games, and that they would each do the best they could. Richardson said,

But we certainly understand the pressures, and that's what we talked a little bit about, is that, "Hey, you do the best you can and I'll do the best I can and we'll leave the rest to the good man upstairs. We ain't going to have to worry about all that." If they go ahead and pay me my money, they can take the job tomorrow. That's the bottom line because it is a business and we've got to work hard and try to get our kids to play the best they possibly can.

Appellant's App. at 5296. Following the press conference, Richardson twice more commented that UAF could replace him by buying him out.

White became aware of Richardson's post-game comments the next day, February 24, when asked about them by news reporters. White responded that he thought Richardson had made the comments in the heat of the moment out of frustration over a difficult season. He also stated that he expected Richardson to complete his contract. Meanwhile, that same morning, Broyles had read three press accounts of Richardson's statement. Later that day, Broyles asked to meet with White to discuss Richardson's comments. Before meeting with Broyles, White spoke with Fred Vorsanger, manager of UAF's Bud Walton Arena, at a women's basketball game. In their conversation, Vorsanger told White that he was not surprised by Richardson's comments at the press conference because Richardson had made the same comment to Vorsanger several times. Vorsanger told White that Richardson had once said, "If they don't think I'm doing a good job or don't want me here, they can buy me out." Id. at 1635.

Broyles and White talked about Richardson's comments four times on February 24. At one meeting, Broyles told White that he had spoken with someone with an athletic background, who told Broyles that when a coach says something like Richardson had said at the press conference, it means the coach "want[s] out." Id. at 1000. Later that day, White's impression of Richardson's statement changed, and he felt the statement was "all about the money" and showed a "lack of commitment to

-4-

the university." Id. at 1034-35. White believed Richardson's statement was damaging to basketball recruiting. Id.

At a final meeting on February 24, Broyles expressed to White that he thought Richardson wanted to retire but was trying to find a way to be fired in order to take advantage of the buyout clause in Richardson's contract. Broyles told White that what Richardson had publicly said was "so damaging, it was irreparable," and that he should be terminated under the contract. Id. at 349. Broyles testified that his comment was in concurrence with White's suggestion to Broyles that Richardson be terminated because of the statement.

After the meetings with Broyles, White called Sugg the evening of February 24. White told Sugg that he and Broyles had conferenced, and that White decided, with Broyles' concurrence, to fire Richardson. Sugg agreed. He had seen Richardson's comments on television, and was "stunned" and "shocked." Id. at 4166.

> I couldn't believe he was saying it. I said [to the television], Coach, why are you saying that? I thought it was – it was a put-down to the fans of Arkansas, to the basketball program, and to the University of Arkansas. And I said, I just cannot believe you're saying that.

Id. at 4166-67. Sugg contacted the members of the Board of Trustees that he could locate that evening to let them know of the decision. Each board member who was contacted testified that they agreed with the decision.

On the morning of February 25, White told Gail Moore, his executive assistant; Dr. Dave Gearhart, Vice Chancellor for University Advancement; and Dr. Roger Williams, Associate Vice Chancellor for University Relations; that a decision had been made to give Richardson a chance to resign or retire, and failing that, to fire him. That afternoon, Richardson held another press conference, which turned into a lecture of the press corps about the fact that he did not ask to be hired by UAF but that they

-5-

had recruited him, how from that day forward he was shutting off press access to himself and his team except in press conferences, and that during press conferences they would have "twenty minutes to ask . . . as many questions as you possibly can." Id. at 5719. He also opined about a lack of racial diversity among the press corps and racial inequality in his job. Richardson reiterated that "when they [Broyles, White, and Sugg] decide that it's enough, then that's when they can pay me off and I'll be on my way." Id. at 5718.

White and Broyles met with Richardson on February 28, following Richardson's return from an away basketball game. The two told Richardson that they had concluded it was time for a change in leadership of the basketball team, and attempted to get Richardson to retire so that they would not have to fire him. Richardson was offered the buyout under his contract, amounting to $500,000 annually for six years, as well as full retiree benefits. Richardson refused to retire and told the two they would have to fire him.

The next day, March 1, 2002, White dispatched a letter to Richardson stating that, given White's decision that new leadership was needed for the basketball team, and since Richardson had declined to retire, he was terminated effective immediately. The letter informed Richardson he had the right, under his employment contract, to request that Sugg review the decision. Sugg did so, and on March 21 issued a letter to Richardson confirming the decision.

## II.    DISCUSSION

Because this case was tried to the judge, we review the trial court's factual findings for clear error and its legal conclusions de novo. Tadlock v. Powell, 291 F.3d 541, 546 (8th Cir. 2002). Using this standard, we will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that

-6-

an error was made. Id. (citing Estate of Davis v. Delo, 115 F.3d 1388, 1393-94 (8th Cir. 1997)). We afford due regard to the district court's judgment of the credibility of the witnesses. Id. A factual finding supported by substantial evidence, as well as a district court's choice between two permissible views of the evidence, are not clearly erroneous. Id.

We deal first with Defendants' cross-appeal, for if it is successful, Richardson's claims are barred.

## A.     Does Richardson's Contract Bar His Claims?

Section 12 of the Contract provides that should Richardson be terminated by the university at its "convenience" (meaning at any time, for any reason), he would "accept the guaranty of the Razorback Foundation, Inc. . . . as full and complete satisfaction of any obligations of the University." That guaranty is defined in Section 9 of the Guaranty agreement: "If Richardson is terminated for the convenience of the University of Arkansas, the Foundation shall pay to Richardson the sum of Five Hundred Thousand Dollars ($500,000) per year . . . for the remaining period left on the Employment Agreement." The Contract also provides that "[i]n consideration of such guaranty . . . [Richardson] will, and does hereby, release and discharge the University, its officers, trustees and employees from and against any liability of any nature whatsoever related to or arising out of this Agreement and [Richardson's] termination for convenience of the University hereunder." Defendants argue that through this clause, Richardson agreed to forgo any employment claims, accrued or prospective, he had or might have against the university.

The district court held that Title VII rights may not be prospectively waived and held the clause effective only as to any claims Richardson had at the time of executing the contract. The court also held that the common law doctrines of tender back and ratification did not commit Richardson to the release clause. On appeal,

Defendants argue that Richardson is bound by the release clause because (1) persons may contract to waive prospective claims under Title VII, or (2) Richardson's acceptance of the guaranty payments after he was fired and failure to tender them back constitutes ratification of the release.

### 1. Prospective Waiver of Title VII Claims

Defendants begin their argument by trying to deal with the elephant in the room–a Supreme Court case that apparently forecloses their assertion. They acknowledge the Court's statement in <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36 (1974) that "we think it clear that there can be no prospective waiver of an employee's rights under Title VII," but claim this pronouncement is limited to collective bargaining agreements (CBAs). <u>Id.</u> at 51. But the context of the Supreme Court's statement does not limit it to CBAs. In <u>Gardner-Denver</u>, the plaintiff brought suit against his employer for discrimination after having pursued arbitration under the CBA negotiated by his union. The Court rejected election-of-remedy and waiver arguments. Regarding the purported waiver, the Court stated "[w]e are . . . unable to accept the proposition that petitioner waived his cause of action under Title VII. *To begin, we think it clear that there can be no prospective waiver of an employee's rights under Title VII.*" <u>Id.</u> (emphasis added). The Court said only that the rights conferred by Title VII "can form no part of the collective-bargaining process since *waiver of these rights would defeat the paramount congressional purpose behind Title VII*. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver."[3] <u>Id.</u> at 51-52 (emphasis added). The Court was applying a *general rule*–that Title VII rights cannot be waived–to the CBA context.

_____

[3]Defendants seize upon the Court's choice of words in this last sentence, "in these circumstances," to show that its discussion of the non-waivability of prospective claims applies only in the CBA context. Whatever their meaning in that sentence, they do not diminish the broader rule stated at the beginning of that section–that Title VII rights cannot be prospectively waived.

Later in the opinion, the Court noted that while presumably employees could waive Title VII as part of a settlement agreement, submitting the claim to arbitration did not constitute such a waiver. "*Since an employee's rights under Title VII may not be waived prospectively*, existing contractual rights and remedies against discrimination must result from *other* concessions already made by the union as part of the economic bargain struck with the employer." Id. at 52 (emphasis added) (contrasting the collective rights of employees such as the right to strike, which a union may relinquish in the process of bargaining with an employer for collective economic benefits; with individual rights conferred by Title VII, which belong to the individual and may not be collectively bargained).

A number of other circuits have also held, relying on Gardner-Denver, that persons may not contract away prospective claims under Title VII. Adams v. Philip Morris, Inc., 67 F.3d 580, 584 (6th Cir. 1995) ("The Supreme Court has stated that 'an employee's rights under Title VII are not susceptible of prospective waiver.' . . . It is the general rule in this circuit that an employee may not prospectively waive his or her rights under either Title VII or the ADEA [Age Discrimination in Employment Act].") (quoting Gardner-Denver, 415 U.S. at 51-52); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1482 (D.C. Cir. 1997) (stating, in support of the proposition that arbitration agreements are not always enforceable, that employees cannot be held to an agreement that waives their right to be free from discrimination as a condition of employment, and citing Adams for the rule that employees may not prospectively waive Title VII rights); Thompson v. Plante & Moran, No. 95-2019, 1996 WL 616675, at *3 (6th Cir., Oct. 24, 1996) (unpublished) (citing Adams for the proposition that "[a]n employee may . . . waive rights under Title VII or the ADEA that have already accrued, but an employee cannot waive claims arising from conduct that has not yet occurred"); Kendall v. Watkins, 998 F.2d 848, 851 (10th Cir. 1993) (citing Gardner-Denver in holding that "an employee may agree to waive Title VII rights that have accrued, but cannot waive rights that have not yet accrued"); Rogers v. Gen. Elec. Co., 781 F.2d 452, 454 (5th Cir. 1986) ("[A]n employee may validly

release only those Title VII claims arising from 'discriminatory acts or practices which antedate the execution of the release.' . . . Thus, an otherwise valid release that waives prospective Title VII rights is invalid as violative of public policy.") (quoting United States v. Allegheny-Ludlum Indus., Inc., 517 F.2d 826, 853 (5th Cir. 1975)).

The public policy concerns that inhere in allowing prospective waivers of Title VII rights support the conclusion that such waiver is invalid. First, Congress designed Title VII so that the enforcement of its substantive measures against employers would be effected, at least in substantial part, through private individuals asserting a claim. "In such cases, the private litigant not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices." Gardner-Denver, 415 U.S. at 45. Allowing an employee to bargain away the right to pursue a prospective discrimination claim frustrates this statutory scheme. Second, allowing employers to ink a deal with an employee to waive prospective claims strikes at the heart of Congress' aim to deter discriminatory conduct by employers. "An employer cannot purchase a license to discriminate. An employment agreement that attempts to settle prospective claims of discrimination for job applicants or current employees may violate public policy under Gardner-Denver . . . ." Adams, 67 F.3d at 585.

Defendants cite Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991) for the proposition that so long as an employee may vindicate statutory rights by *any other means* (even by contracting to waive prospective claims in return for monetary compensation), the goals of civil rights statutes are preserved. This is an overly broad reading of what the Court said. Gilmer does not say that persons may waive prospective civil rights claims. Rather, Gilmer stands for the proposition that employees may make the individual decision to contract away a right to have a *federal court* hear a civil rights claim in favor of an *arbitration forum*. Citing cases where it had recognized that statutory rights may be subject to an arbitration clause, the Court said "[i]n these cases we recognized that by agreeing to arbitrate a statutory

-10-

claim, a party *does not forgo the substantive rights afforded by the statute*; it only submits to their resolution in an *arbitral, rather than a judicial, forum*." Id. at 26 (emphasis added) (internal quotations and alterations omitted). See Taylor v. Progress Energy, Inc., 415 F.3d 364, 372 (4th Cir. 2005) ("An agreement to arbitrate preserves the claim; the agreement simply shifts the forum for resolving the claim from a court to an arbitration setting."). The upshot is that so long as *some forum* is available to hear prospective claims, civil rights statutes are not violated. The Court later said that "'[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action *in the arbitral forum*, the statute will continue to serve both its remedial and deterrent function.'" Gilmer, 500 U.S. at 28 (emphasis added) (second alteration in original) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 (1985)).

Defendants also cite this court's decision in Patterson v. Tenet Healthcare, Inc., 113 F.3d 832 (8th Cir. 1997), for the proposition that an employee may contractually waive his right to vindicate a prospective Title VII claim in court. It is true Patterson says that, but only where an alternative *arbitration forum* is available. In that case, a forum was still available to hear prospective claims. That is not the case here. Defendants assert that Richardson could and did *waive* any prospective claims under Title VII. Existing Supreme Court precedent forecloses that assertion. We hold that Richardson could not, and thus did not, waive his prospective claims under Title VII.

### 2. Tender-Back and Ratification

Defendants argue in the alternative that under general contract law, since Richardson has retained moneys under the guaranty, he has ratified the waiver clause, making it applicable to his prospective claims, and that unless he tenders back the moneys received, he may not bring suit. We likewise reject this argument.

-11-

The Supreme Court has not addressed the applicability of the tender-back and ratification doctrines to Title VII claims, but in Oubre v. Entergy Operations, Inc., 522 U.S. 422 (1998), the Court addressed their applicability to claims under the ADEA. While Oubre involved considerations not directly implicated in this case, the Court's decision persuasively guides us to ours.

In Oubre, the plaintiff signed a release as part of a termination agreement from her position with Entergy that purported to discharge Entergy from any claims arising from her employment. Oubre later brought an age discrimination claim under the ADEA. Entergy asserted that the claim was barred by the release she signed. But the release did not comply with a provision in the ADEA (created by the Old Workers Benefit Protection Act (OWBPA)) that prescribes standards that must be followed for a release of claims to be valid. Entergy admitted the release was defective, but argued the doctrines of tender-back and ratification still barred Oubre's suit. The Court held otherwise. "The statutory command is clear: An employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's requirements." Id. at 426-27. In the instant case, Title VII does not have a similar statutory requirement for releases. But the Court, in analyzing the waivability of prospective discrimination claims, has stated in equally strict terms: "[W]e think it clear that there can be *no* prospective waiver of an employee's rights under Title VII." Gardner-Denver, 415 U.S. at 51 (emphasis added). In Taylor, the Fourth Circuit held that because the Family Medical Leave Act (FMLA) prohibits waiver or release of FMLA claims, such waivers or releases could not be ratified. "Because FMLA claims are not waivable by agreement, neither are they waivable by ratification." 415 F.3d at 372. We apply the same reasoning. Since prospective Title VII claims are not waivable by virtue of the Supreme Court's command in Gardner-Denver, neither are they susceptible to ratification.

Moreover, the reasoning the Court used in Oubre is equally applicable to Title VII:

-12-

> [Applying the tender-back and ratification doctrines] would frustrate the statute's *practical operation* . . . . In many instances a discharged employee likely will have spent the moneys received and will lack the means to tender their return. These realities might tempt employers to risk noncompliance with the OWBPA's waiver provisions, knowing it will be difficult to repay the moneys and relying on ratification. We ought not to open the door to an evasion of the statute by this device.

Oubre, 522 U.S. at 427. The same applies to prospective releases under Title VII. To forbid them as a matter of policy, but then allow them to be saved under the doctrines of tender-back or ratification, would frustrate the no-prospective-waiver rule, and thereby Title VII's objectives.

Few other courts have dealt with the applicability of the tender-back and ratification doctrines to Title VII claims. In Fleming v. United States Postal Service AMF O'Hare, 27 F.3d 259 (7th Cir. 1994), the court held that the plaintiff in a Title VII case had to tender back payments received under a settlement agreement with the postal service before she could bring an employment suit. The court decided that, since Title VII does not statutorily regulate releases like the Federal Employers' Liability Act (FELA), the Jones Act, or the ADEA, ordinary contract rules like tender-back and ratification apply. "This is a garden-variety rescission case requiring tender back of consideration received." Id. at 262.

However, two important caveats counsel that we not rely on Fleming. First, the case deals with a settlement agreement executed by both parties to dispense with *accrued* employment claims, which agreements are not invalid under Title VII as the Supreme Court recognized in Gardner-Denver. "[P]resumably an employee may waive his cause of action under Title VII as part of a voluntary settlement . . . ." Gardner-Denver, 415 U.S. at 52. In the instant case, we deal with a prospective waiver, not a settlement of accrued claims. Second, Fleming was decided without the

-13-

aid of Oubre's policy underpinnings to the effect that releases of claims under remedial statutes like the ADEA and Title VII frustrate the purposes of those statutes.

Given the policy concerns that rendered invalid the release at issue in Oubre, and the fact that the release of prospective claims is invalid under Gardner-Denver, we find that the doctrines of tender-back and ratification do not bar Richardson's suit. Given that Richardson could not prospectively waive his Title VII claims, and the inapplicability of the tender-back and ratification doctrines, we hold that Richardson's claims in this case are not barred.

## B.      Richardson's Race Claims

The district court found that Richardson had not proven by a preponderance of the evidence that his firing was because of his race. Richardson argues that under either a mixed-motive analysis or the familiar McDonnell-Douglas framework, the evidence proves that he was a victim of race discrimination.

### 1.      Mixed-Motive Analysis

Richardson first argues that the district court erred in not applying a mixed-motive analysis. A mixed-motive case is one in which "it has been shown that an employment decision resulted from a mixture of legitimate and illegitimate motives." Price Waterhouse v. Hopkins, 490 U.S. 228, 232 (1989). To qualify for application of the mixed-motive analysis, the plaintiff must "demonstrate that an illegitimate criterion was a motivating factor in the employment decision." Stacks v. Sw. Bell Yellow Pages, Inc., 996 F.2d 200, 201-02 (8th Cir. 1993); 42 U.S.C. § 2000e-2(m). Once that has occurred, the employer may come forward with an affirmative defense that it would have made the same decision absent the illegal criterion. Price Waterhouse, 490 U.S. at 246 ("[T]he employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and

-14-

then the employer, if it wishes to prevail, must persuade it on another."). The employer's affirmative defense "does not absolve it of liability, but restricts the remedies available to a plaintiff." Desert Palace, Inc. v. Costa, 539 U.S. 90, 94 (2003); 42 U.S.C. § 2000e-5(g)(2)(B).

The principal evidence meriting a mixed-motive analysis was an incident that occurred at a sports banquet in February 2000, some two years before Richardson's ultimate termination. On February 17, Richardson contacted Wally Hall, a sports writer, to complain about an article Hall had written that was critical of Richardson's son. In the course of the conversation, Richardson called Hall a "redneck." Hall wrote an article on February 18 about the exchange, and said Richardson had called Razorback fans "redneck SOB's." Fans from east Arkansas called Jim Lindsey, a former member of the Board of Trustees, complaining about Richardson's comment. Lindsey contacted Broyles and told him he thought the statement justified Richardson being fired. The night of February 18, Broyles attended a sports banquet and sat next to members of the media. Broyles asked Clay Henry, a sports columnist, if he would write a column equating Richardson's calling white people "rednecks" with a white person calling Richardson a "nigger." Henry told Broyles he wanted to avoid controversy. Henry later told Richardson about the conversation. At trial, Henry testified that Broyles was quoting someone else when he used the word "nigger," and that it was not a direct statement from Broyles. The district court credited the testimony of Paul Eels, also seated next to Broyles at the banquet, who said that Broyles was not quoting someone else, but the court did not find the distinction noteworthy, finding the fact that Broyles solicited the article at all the important evidence.

The district court found that Broyles' statement was "direct evidence of discrimination and is sufficient to require a mixed motive analysis of any employment decisions made by Broyles *before* October 2000 . . . ." The court later stated that "[w]hile I do believe the statements at the banquet would have required a direct

-15-

evidence standard of review to any claims pre-October 2000, I do not believe that they carry over for the reasons stated below." The court then held the statement could not be viewed as bearing on decisions made after that date because it found that Broyles and Richardson had "buried the hatchet" just after the signing of Richardson's new contract in October 2000. The record contains cordial letters and statements between Broyles and Richardson at that time, prompting the district court to hold that "[t]here is substantial evidence that demonstrates that the problems between Broyles and Richardson had been resolved."

The district court's use of the term "direct evidence" is best understood in the context of legal causation, and not to distinguish it from "circumstantial evidence." In Stacks, the court noted:

> We use [the] term ["demonstrate" in the context of racial bias] advisedly, in order to avoid the "thicket" created by some courts' use of the term "direct evidence" to describe the plaintiff's initial burden of proof in a *Price Waterhouse* case. We conclude that there is no restriction on the *type* of evidence a plaintiff may produce to demonstrate that an illegitimate criterion was a motivating factor in the challenged employment decision. The plaintiff need only present evidence, be it direct or circumstantial, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision.

996 F.2d at 201 n.1 (citation omitted). In the context of determining whether the evidence warrants an application of a mixed-motive analysis, "'direct' refers to the *causal strength of the proof*, not whether it is 'circumstantial' evidence." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) (emphasis added). With that in mind, we find no error in the district court's evaluation.

In order to merit a mixed-motive inquiry, the plaintiff must show a "'specific link between the discriminatory animus and the challenged [employment] decision.'"

-16-

Philipp v. ANR Freight Sys., Inc., 61 F.3d 669, 673 (8th Cir. 1995) (quoting Stacks, 996 F.2d at 201 n.1). The required causal link renders stray remarks, statements by nondecisionmakers, or statements by decisionmakers that are unrelated to the decisional process insufficient to require a mixed-motive analysis. Id. And though the district court discounted it, we find the span of time between Broyles' remarks and the decision to fire Richardson relevant to a determination of whether discriminatory animus motivated the firing. See Simmons v. Océ-USA, Inc., 174 F.3d 913, 916 (8th Cir. 1999).

We need not weigh in on the correctness of the district court's finding that Broyles' remarks at the sports banquet were "direct" evidence–evidence strong enough to causally link the statement to adverse employment actions–of racial animus in employment actions taken before October 2000. That is because Richardson was fired nearly two years later, and we agree with the district court's finding that Richardson and Broyles had made amends by then. The importance of the ample record evidence of the goodwill between Broyles and Richardson is that it substantially severs any possible causal link between the comments Broyles made at the 2000 sports banquet, and any animus Broyles allegedly might have had toward Richardson at that time, and the decision to fire Richardson in 2002.[4] Further, the

---

[4]In addition to testimony by staff close to Broyles and Richardson that the two had made amends, Richardson wrote Broyles a letter in September 2000 extending an olive branch:

> The 2000-2001 Millennium year is upon us. The past 15 years has [sic] been very rewarding for me having one of the best jobs in the country. I am very proud of the fact that you gave me this opportunity.
>
> Now, I am trying to focus on winning another National Championship. There is no question that I would need your support in trying to get this mission accomplished. I have always had the utmost respect for you as a person and an athletic director. Probably there were times when the

-17-

time-span between the comments and Richardson's firing required Richardson to establish a causal link.  "Because the [racially-charged] statements [by a supervisor] and the adverse employment decision were not close in time, [separated by some two years,] [plaintiff] must establish a causal link between the comments and his termination."  Id. at 916.  See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 779

<div style="margin-left:2em">

line of communication between us was not where it should have been. However, I feel we can work through that because we both want to make Arkansas the best program in the country. . . .
Once again, you are my boss and I will follow your lead to further establish the U of A Basketball Program and Athletic Department.

If you need me at anytime, please call and I will make myself available to you.

</div>

Broyles responded in a letter to Richardson:

<div style="margin-left:2em">

Your letter was the first thing I saw when I got to the office this morning and I cannot tell you how happy I was to read your words.  In recent months, not a day has gone by that I didn't wish for us to return to our former comfortable relationship and communication.  I agree with you that we can work through whatever we need to do in order for that to happen.

Nolan, you have my complete support and whatever assistance I can provide to achieve the goal of winning another National Championship. We truly appreciate your commitment to extra efforts toward graduation rates and your willingness to promote the entire department in our goals of national competitiveness in all sports. . . .

Before your season begins, if time permits, I'd like to have an opportunity for us to sit down and visit in person.

</div>

-18-

(8th Cir. 1995) ("[W]e [have] held that a four-year gap between the statement and the termination rendered the statement effectively stale when it came to allowing an inference of intentional discrimination. Because these statements had an insufficient causal relationship to the actual decision to terminate, we [have] ruled that they could not support a jury finding of intentional discrimination.").

Richardson asserts that the district court was wrong in not considering or erroneously discounting other scattered evidence purporting to discredit the notion that Richardson and Broyles had made amends. Reviewing the district court's factual determinations in these matters, we cannot say it clearly erred.

Richardson also asserts that the district court erred in not applying a "cat's paw" analysis to the evidence he presented at trial. It does not appear Richardson squarely raised this argument below. "[W]e will not consider arguments raised for the first time on appeal." Alexander v. Pathfinder, Inc., 189 F.3d 735, 742 (8th Cir. 1999). Nonetheless, the district court's conclusion that the clincher in support of the articulated reason for firing Richardson was Sugg's (who had to approve the firing and who the court found was not motivated by race) view of Richardson's comments, is not clearly erroneous, and forecloses a "cat's paw" evaluation.

This circuit's "cat's paw" rule provides that "an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." Dedmon v. Staley, 315 F.3d 948, 949 n.2 (8th Cir. 2003). Where a decisionmaker makes an independent determination as to whether an employee should be terminated and does not serve as a mere conduit for another's discriminatory motives, the "cat's-paw" theory fails. Lacks v. Ferguson Reorganized Sch. Dist. R-2, 147 F.3d 718, 725 (8th Cir. 1998). In this case, any claim that Broyles used White and/or Sugg as a "cat's paw" to advance any animus he might have held

fails. Richardson's contract provided for independent review by Sugg of any decision to fire Richardson, which review was amply undertaken, and Sugg's own impression of Richardson's comments at the press conference provided an independent basis for his decision to approve Richardson's termination. As such, Sugg, who had the final say on Richardson's termination, was not used as a "cat's paw" to carry out someone else's alleged discriminatory motive.

## 2. The McDonnell Douglas Framework

Richardson argues alternatively that this case should be analyzed under the familiar McDonnell Douglas burden-shifting framework. Under McDonnell Douglas, when a plaintiff meets his burden of establishing a prima facie case of employment discrimination, a presumption of such discrimination is created. Davis v. KARK-TV, Inc., 421 F.3d 699, 704 (8th Cir. 2005). To establish a prima facie case, the plaintiff must show (1) he is a member of a protected class, (2) he met the legitimate expectations of his employer, (3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of the protected class received different treatment. Id. "Once a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate 'a legitimate, non-discriminatory reason for its adverse employment action.'" Id. (quoting Williams v. Ford Motor Co., 14 F.3d 1305, 1309 (8th Cir.1994)). "If the employer meets its burden, 'the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination.' The plaintiff has the burden of persuasion at all times." Id. (quoting Pope v. ESA Servs., Inc., 406 F.3d 1001, 1007 (8th Cir. 2005)).

Richardson challenges the district court's conclusion that Defendants' stated reason for firing Richardson–the "buy me out" comment at the February 23 press conference–was not pretext for a racially discriminatory action. Richardson asserts that the district court "essentially found that the reason given for terminating

-20-

Richardson was false, but de-emphasized this finding." Br. of Appellant at 69. The district court made no such finding and, by weighing all of the evidence as it related to the February 23 comments, found quite the opposite.

At trial, Richardson asserted that the "buy me out" reason was pretext because he had made a similar remark in a press conference in 1995 and was not terminated. The district court considered Defendants' reply that the contexts in which both comments were made were quite different. The court stated, "Quite frankly, I am not convinced. It could be argued that the 1995 remarks were worse. . . . According to the testimony of Richardson's secretary, and Scott Cain, a news reporter, Richardson made this type of statement often." The court said only that it was not convinced the two statements were substantially different; not that it was not convinced that Defendants' reason was free of pretext. The court made no conclusion on the matter at that point, but moved on to Richardson's other pieces of evidence of alleged pretext, rejecting each.

The court then returned to two key pieces of evidence bearing on Richardson's "buy me out" statement made in 2002 and Defendants' use of it as a basis for firing him. First, the court pointed to testimony by Doug Dickey, a former athletic director at the University of Tennessee. The court found his testimony "impressive and convincing" concerning the need for a college basketball program to have a particular "public aura." That testimony included assertions that since basketball programs are in the marketing and entertainment business, for a program to be successful, the public needs to know that its coach is content with the university, and that s/he is a "player on the team," so that fans will buy tickets and support the team. Dickey testified that he had fired a basketball coach for saying, "If they want somebody else to do this job, just pay me off." Second, the court cited the fact that Sugg saw Richardson's statements at the February 23 press conference as "the clincher for Defendants' articulated reason for the firing." That is because Sugg testified that he thought Richardson's remarks were a slap in the face of the fans, the university, and

the Razorback program. The district court found no suggestion of racial animus by Sugg against Richardson, and credited Richardson's testimony that he had a great deal of respect for Sugg. Thus, Sugg, the university official who had to approve Richardson's firing, stood free of any allegations of racial discrimination, and his assertion of Richardson's statement as the reason for his firing negates any claim that such reason is mere pretext.

We can find no fault in the district court's thorough analysis on this point, and agree that Richardson failed in his burden to show pretext. As such, Defendants' legitimate, nondiscriminatory reason for firing Richardson stands undiminished. Thus, any presumption of race-based animus vanished and Richardson offered no other evidence in support of his continuing burden to prove unlawful discrimination. We therefore conclude, as did the district court, that Richardson was not fired because of his race.

## C.    Richardson's First Amendment Claims

### 1.    The February 11, 2002, Statement

Richardson asserts he was fired, in part, because of comments he made on February 11, 2002, reported in a February 12 Morning News/RazorbackCentral Internet news article, as well as his comments at the February 25, 2002, press conference. In the February 11 statement, Richardson opined about the difficulty recruiting basketball players:

> Richardson said the Razorbacks have had to fight many problems, from negative recruiting to an NCAA investigation into the program in the mid-1990's, and that has made it difficult to convince kids to attend Arkansas. "Coaches say, 'If you want to go to Arkansas, are you going to the blue-light sale on Saturdays and Sundays?'" Richardson said.

"They ain't got nothing to do there but play basketball. You've got to have a social life."

Appellant's App. at 5500. Richardson contends that his "blue-light sale" comment touched on a matter of public concern to the Fayetteville community, specifically that black students and student athletes who attend UAF have limited social opportunities beyond going to class or playing a sport at the university.

In Pickering v. Board of Education, 391 U.S. 563, 568 (1968), the Court said that statements of public employees on matters of public interest are entitled to First Amendment protection. "'[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.'" Id. (quoting Keyishian v. Bd. of Regents, 385 U.S. 589, 605-06 (1967)). But the Court also recognized the government's interest as an employer in the orderly administration of the public's business. Id. at 569. The result was the so-called Pickering balancing test, which seeks to "balance . . . the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568. In Connick v. Myers, 461 U.S. 138 (1983), the Court reemphasized that Pickering applied to statements made by a public employee "'as a citizen, in commenting upon matters of public concern.'" Id. at 143 (quoting Pickering, 391 U.S. at 568). The Court in Connick also stated that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48.

In evaluating a claim by an employee that s/he was discharged because of speech, courts must employ the Connick two-part test. Barnard v. Jackson County, 43 F.3d 1218, 1223 (8th Cir. 1995). That is, first, we must determine whether the speech at issue can be "'fairly characterized as constituting speech on a matter of

-23-

public concern.'" Id. (quoting Connick, 461 U.S. at 146). If so, we then move to step two, which is to undertake the Pickering balancing. Id. "These two questions are matters of law for the court to resolve." Id. The Pickering balancing "requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Connick, 461 U.S. at 150. Factors considered include any detrimental impact the speech has on working relationships, loyalty, confidence, or the efficient working of government. Barnard, 43 F.3d at 1224. "Employee acts of insubordination may tip the balancing process in favor of the employer's interests in the efficient promotion of its services." Id. The primary question in applying the Pickering balancing is whether the employee's speech has undermined "'the effective functioning of the public employer's enterprise.'" Id. (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).

Only after applying the Connick two-part test do we then ask whether the plaintiff has met the burden to show that the speech was a motivating factor in the employment decision. Id. at 1226. If so, the burden shifts to the employer to prove it would have made the same decision in the absence of the speech. Id.

Richardson contends that the "blue-light sale" comment addressed a matter of racial diversity and opportunity. Looking to the content, form, and context of the "blue-light sale" comment, as revealed by the whole record, we do not find that it addresses a matter of public concern. While matters of racial discrimination are "inherently of public concern," Connick, 461 U.S. at 148 n.8, neither the content nor context of Richardson's statement indicate that he was addressing race matters. The comment was Richardson's characterization of what other coaches were telling athletes looking at the Razorbacks, and was made in the course of Richardson explaining recruiting challenges caused in part by an NCAA investigation. In Pickering, the issue about which a school teacher wrote a letter that was published in a local newspaper, involved a proposed tax increase by the board of education, and concerns about how the board and superintendent had handled past revenue

-24-

proposals. The content of the letter directly addressed a matter of public concern–taxes. In this case, though Richardson attempts to characterize the "blue-light sale" comment as a matter of racial diversity, its content does not plainly convey that. Nor does its context. We agree with the district court that Richardson's February 11, 2002, comment did not touch on a matter of public concern for purposes of the Connick test.

Even if we were to find that Richardson's statement met the first step in Connick, under part two–the Pickering balancing–we would find that Defendants' concerns about the statements outweigh his right to make them as a citizen. The record indicates that both Broyles and Sugg believed the comment was detrimental to the recruiting efforts of UAF teams. Specifically, Sugg testified that Razorback head football coach Houston Nutt was troubled about the statement's impact on recruiting for his team because other coaches were using it to lure recruits away from UAF. The district court credited the testimony of Doug Dickey for its McDonnell Douglas context, but under the Connick test, Dickey's testimony also bears on the legitimacy of Defendants' concerns about Richardson's statement. Dickey testified that head sports coaches at a university are part of a team effort to promote their sports and the university. He noted that such a team endeavor operates in a competitive marketing and entertainment environment, competing for fans. As such, a few major sports often finance several other minor sports at a university. Dickey emphasized that when the public perceives lackluster support from a coach, public support, which can impact financial support, also decreases. In sum, we find that the record amply supports a conclusion that Richardson's statement had a detrimental impact on the effective functioning of the public employer's enterprise–namely, the university's total athletic program. This public interest clearly outweighed any First Amendment privilege Richardson allegedly may have had in the making of the comment.

Finally, even if we were to advance beyond the Connick two-part test, we agree with the district court that there is no direct evidence that Richardson's February 11 statement was a factor in the decision to fire him. Richardson points only to the proximity in time to his termination, to argue that the statement was a motivating factor in that decision. By contrast, the employers in both Pickering and Connick specifically stated they were terminating the employees in those cases because of the *statements* they had made. We find the proximity argument too tenuous and hold that Richardson's statement was not a factor in his firing.

## 2. Timing of the Decision to Fire Richardson

Richardson claims that statements he made at the February 25, 2002, press conference were also a factor in the decision to fire him, and thus violated his First Amendment rights. This claim, as well as Richardson's claim of retaliation, hinges on when the decision was made to discharge Richardson. Because the district court found that the decision was made on February 24, it did not reach the question of whether statements made by Richardson on February 25 were protected by the First Amendment, and it did not mention Richardson's retaliation claim based on the February 25 statements. We agree with the district court and similarly do not reach Richardson's claims based on those statements.

Substantial evidence in the record supports the district court's conclusion that the decision to fire Richardson was made by White and Sugg on February 24, several hours before Richardson even uttered his comments at the February 25 press conference. Throughout briefing, Richardson consistently refers to the "March 1" decision to fire him. But March 1 is the date White sent Richardson a memo *confirming* that a decision had already been made to terminate him, and that he had the option of having Sugg review the decision. Richardson also relies on language in a March 5 memo from White to Richardson's file wherein White states, "[i]t was clear to me that relations with the media and fans were irreparably damaged through

-26-

the combination of Nolan's remarks on Saturday [February 23] and Monday [February 25]." But just before that statement, White penned that a tape of the February 23 press conference "*confirmed* the necessity to move forward with the actions *I had discussed with Frank Broyles* [on February 24]." This, combined with record evidence recounted above about how the decision was made to fire Richardson, leads us to the same conclusion as the district court: that the decision to terminate was made February 24, in advance of Richardson's February 25 comments.

Finally, Richardson points to Sugg's letter upholding White's decision as proof that it was made after February 25. That conclusion can be arrived at only by taking portions of the letter out of context. Sugg's letter, quoting university general counsel, stated:

> "On Sunday, February 24, 2002, Chancellor White and Coach Broyles discussed Coach Richardson's published comments following the Kentucky game. Chancellor White had also become aware earlier that day of private comments made by Coach Richardson on February 22 to the same effect. Chancellor White and Coach Broyles concluded that the comments by Coach Richardson indicating that he could be bought out of his contract immediately indicated a lack of his confidence in the basketball program and leadership for it. They also believed these comments to have a negative impact on fan support and other aspects of the program. Likewise it undermined their confidence in Coach Richardson's leadership for the future."

Appellant's App. at 5450. In the next paragraph, Sugg expands on the reason the decision to terminate was made: "Coach Richardson's recent public and private comments clearly indicated that he wanted out of the Employment Agreement." As further support for the assertion that Richardson wanted out of his contract, and *not* as a further *reason* for the decision to terminate him, Sugg noted Richardson's comments at the February 25 press conference.

> This was *further substantiated* by his published comments on Monday, February 25, 2002, during which Coach Richardson, with deliberation, restated that when Coach Broyles, Dr. White and Dr. Sugg decide that "it's enough, then that's when they can pay me off and I'll be on my way."

Appellant's App. at 5450 (emphasis added). We find the evidence supports the conclusion that the decision to fire Richardson was made on February 24. At the very least, it provides ample proof that the district court was not clearly erroneous in its factual finding on this issue. Thus, we need not reach his First Amendment and retaliation claims based on that statement.

## III.  CONCLUSION

We have carefully considered the voluminous record in this case, the briefs, and arguments on appeal, and affirm the district court.

_____